In the Matter of SAFTICRAFT CORPO-
RATION, Bankrupt.

No. 12093.

United States District Court
W. D. Louisiana,
Lafayette Division.

June 30, 1966.

Rudolph O. Vorbusch, New Orleans, La., for bankrupt.

James J. Morrison, New Orleans, La., and Allen R. Bares, Lafayette, La., for petitioning creditor Val-U Investment Corp.

Landry, Watkins, Cousin & Bonin, Alfred S. Landry, New Iberia, La., for petitioning creditor Glazer Steel Corp.

Charles N. Wooten, Lafayette, La., trustee.

PUTNAM, District Judge.

This is a petition for review of an order rendered in the above-captioned matter by the Referee on December 14, 1964. The bankrupt, Safticraft Corporation, was engaged in the ship building business in the parish of St. Mary, Louisiana, within the jurisdiction of this court. During the course of its operations it purchased steel from the petitioner, Glazer Steel Corporation, for the building of a 70-foot tug boat for Cheramie, one of Safticraft's customers. This steel was delivered pursuant to order of the bankrupt between the dates of June 14, 1962 and February 4, 1963, and the total invoice for the materials so furnished amounts to $15,672.51.

The 70-foot tug was designated by the builder as Hull No. 552. It was mortgaged to Val-U Investment Corporation under a chattel mortgage dated September 12, 1962, along with other property belonging to the bankrupt to secure a loan of $85,000.00. The dispute before us is between Glazer and Val-U for payment of their claims. The Referee, by order dated December 14, 1964, rejected Glazer's claims to a vendor's lien and privilege and a material man's lien and privilege for the steel furnished by it, used in the construction of the hull, and ordered that the proceeds of the sale of Hull No. 552, together with other assets of the bankrupt included in the chattel mortgage, be paid to Val-U Investment Corporation.

It is stipulated by the parties that the Glazer steel was ordered for and used in the construction of this hull; that it is not feasible, economically or as a practical matter, to dismantle the hull in question and return the steel to its original condition. It is also agreed that the hull was not completed and at the time of the bankruptcy was still in its cradle at the yard of Safticraft, near Morgan City. At that time it was not capable of being floated.

By letter dated January 29, 1965, the Trustee in Bankruptcy advised the court at the request of the Referee that Hull No. 552 had been separately appraised at the sum of $17,500.00. The brief filed in behalf of Val-U Investment on February 26, 1965, states that it was sold for $12,500.00. In the absence of any contradictory statement, the Court assumes that the fact that it was appraised and sold separately may properly be considered as part of the record for this review. The funds derived from the sale, therefore, are identifiable.

The Court agrees generally with the holding of the Referee in respect to the Vendor's lien which Glazer claims under LSA–C.C. Articles 3217(7) and 3227. The nature of the steel plates has been changed and altered by the work done by Safticraft in constructing Hull 552. In the early case of Carlin v. Gordy, 32 La. Ann. 1285 (1880), the Supreme Court of this state said:

"The privileges resting upon movables are, in some cases, affected by the changes which may take place in the nature or destination of the things. But such changes must be so radical as to create a new species of thing and destroy that species which originally existed—as, *to use the illustrations of Cujas, when a pine or cypress log is converted into a ship, or when wool is converted into a garment, or when marble is made into a statue.*" (Emphasis supplied.)

We conclude that the vendor's privilege, under LSA–C.C. Article 3227 on the steel, is lost.

On the other hand, we do not agree with the Referee that Glazer did not have a privileged debt on Hull No. 552 under the express terms of Article 3237 of the Louisiana Revised Civil Code of 1870. The pertinent part of this Article reads as follows:

"Art. 3237. The following debts are privileged on the price of ships and

other vessels, in the order in which they are placed:

\*　\*　\*　\*　\*　\*

8. Sums due to sellers, *to those who have furnished materials and workmen employed in the construction,* if the vessel has never made a voyage; and those due to creditors for supplies, labor, repairing, victuals, armament and equipment, previous to the departure of the ship, if she has already made a voyage.

\*　\*　\*　\*　\*　\*

The term of prescription of privileges against ships, steamboats and other vessels shall be six months." (Emphasis supplied.)

The Referee dismissed Glazer's claim of privilege as a furnisher of materials used in the construction of the vessel in one paragraph.[1] We believe his conclusions to be predicated upon two grounds which are erroneous. First, at the time of the hearing it was thought that Hull No. 552 had been sold in globo with all other property of the bankrupt. This does not conform to the facts as shown by the letter from the Trustee, mentioned above. Second, the Referee concluded that the definition of the word "vessel" as used in LSA–C.C. Art. 3237, supra, contemplates only a completed ship, such as is defined in Title 1 U.S.C.A. § 3.[2]

LSA–C.C. Art. 3237 is carried over almost verbatim from Article 3204 of the Louisiana Civil Code of 1825. It is found in Chapter 3 of the Code, "Of Privileges on Movables", Section 3, "Of the Privilege On Ships and Merchandise". The opening paragraph is the same as that employed in 1825, as shown by the official translation of the French text. Paragraph 8, in the early version was translated to read as follows:

"8. Sums due to sellers, those who have furnished materials, and workmen employed in the construction, if the vessel has never made a voyage; \* \* \*." (La.Legal Archives, Vol. 3, Part II, p. 1772)

The addition of the word "to" before the word "those", elimination of the comma following the word "materials" and addition of the word "to" after "and", were the only changes made in the revision of 1870. There was no corresponding article in the Louisiana Civil Code of 1808, nor in the Code Napoleon of France, 1804.

The provisions relative to ships stem from Articles 190 and 191 of the French "Code de Commerce", adopted by that country in September, 1807.[3] Counsel for Val-U Investment advance the novel argument that Louisiana, in 1825, excluded from the scope of Article 3204 all claims of creditors of the naval contractor for materials furnished "for ship building (bâtiments de mer)". We are referred to Ripert, Droit Maritime, 3d Ed. (1929), who argued that the privilege of workmen and furnishers of ma-

---

1. "Glazer claims a privilege under La. C.C. Article 3237(8). But this gives a privilege only 'on the price of ships and other vessels,' and as expressly stipulated between the parties, Hull 552 never became a 'ship or other vessel', but remained and was permitted by Glazer to be sold only as an uncompleted hull, incapable of navigation, on the price of which the Civil Code grants no privilege."

2. Title 1 U.S.C.A. § 3 defines "vessel" as follows: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."

3. See: In re Red River Lines, 115 La. 867, 40 So. 250 (1905); Hyde v. Culver, 4 La.Ann. 9 (1849). The pertinent text of these articles as they appeared in Pothier, Vol. 15, "Traite de Commerce, 1809 ed., p. 466, is as follows:

"190. Les navires et autres bâtiments de mer sont meubles.

Néanmoins ils sont affectés aux dettes du vendeur, et spécialement à celles que la loi declare privilégiées."

"191. Sont privilégiées, et dans l'ordre ou elles sont rangées, les dettes ci-apres désignéss:

\*　\*　\*　\*　\*

8. Les sommes dues au vendeur, aux fournisseurs et ouvriers employés à la construction, si le navire n'a point encore fait de voyage; et les sommes dues aux créanciers pour fournitures, travaux, main-d'oeuvre, pour radoub, victuailles, armement et équipement avant le départ du navire, s'il a déjà navigué;"

terials used in the construction of vessels was not really a maritime privilege, and that the preferred status of such claims granted by the French Code was error. The French law was changed by adoption of the Law of February 19, 1949, and such claims are presently excluded from the French Code.

This argument itself refutes the interpretation so placed on "bâtiments de mer". The words are still employed in Article 190 of the French Code, in the same context.[4] Ripert and other French commentators clearly state that historically the "Code de Commerce" applied only to ocean going vessels, and the first sentence of Article 190 of that Code at the time of its adoption and today, reads: "Les navires et autres bâtiments de mer sont meubles." This has generally been considered as meaning ships and other vessels of a seagoing character. See Goirand, French Commercial Law, 2d Ed. 1898, p. 244 et seq. M. Goirand states:

"The present Book of the Commercial Code relates only to ships and other seagoing vessels; the provisions of which we shall now proceed to treat are therefore not applicable to vessels employed in inland navigation, which are especially designated by the name of boats. (Court of Cassation, 7th April, 1874)."

"The title of 'ship', taken in a general sense, comprises therefore all vessels *destined to navigate the seas*." (Emphasis supplied.)

The change argued for by Ripert was finally brought about in France. It was particularly troublesome in maritime commercial dealings. See, La Protection du Creancier, Michel Cabrillac, 1954, Sec. 62, p. 103; Repertoire de Droit Commer-

cial, Dalloz, 1957, Tome II, p. 580, Sec. 3, Privileges sur le navire, pars. 76 et seq. Tome IV, p. 254, Sec. 3, para. 255 et seq.; for the history and significance of the changes wrought in the French law; and for interpretations of the original Articles 190 and 191, which shed additional light upon the arguments of M. Ripert and explain to some degree the intent of the redactors of the Louisiana Code of 1825, see: De Droit Civil, Baudry-Lacantinerie, 1906, Vol. 25, p. 624, para. 696 et seq. particularly para. 698, p. 629; Vol. 26, p. 60, sec. 954 et seq., particularly secs. 956 and 957; and Vol. 27, p. 308, para. 2047.

In 1825, Louisiana did not restrict the privileges on ships to seagoing vessels. It excluded the "droit de suite" provided to *all* creditors of the ship builder by Article 190 of the French Code de Commerce, 1807, and restricted this right to follow the ship to the privileged debts enumerated in Article 3204, by the express provision of Article 3206.[5] Moreover, by using the words "navires et autres embarcations" in Article 3204 instead of "navires et autres bâtiments de mer" found in the French Code, the Louisiana Article was extended to all classes of vessels. The term "embarcations" is generally applied to small boats, harbor craft, and vessels used in inland navigation. New Cassell's French Dictionary, Funk & Wagnalls Co., Inc., N.Y.1962, p. 287; Heath's Standard French & English Dictionary, Ed. by J. E. Mansion, 1961, p. 301; Larousse, Modern Dictionary, English-French, French-English, Librairie Larousse, Paris, 1960, p. 262. Our jurisprudence is replete with cases applying Article 3204 of the Code of 1825 to river boats, steam-

---

4. At present the amended Code de Commerce of France is as follows:

"Art. 190. (L. 19 févr. 1949) *Les navires et autres bâtiments de mer sont meubles.* Ils sont susceptibles d'hypothèques: ils ne peuvent être hypothèqués que par la convention des parties. Le contrat par lequel l'hypothèque maritime est consentie doit être rédigé par écrit: il peut être fait par acte sous signatures privées." (Emphasis supplied.)

5. Article 3206 of the Louisiana Civil Code of 1825 was the same as our present Article 3239, LSA–C.C. 3239, and reads as follows:

"Art. 3239. Creditors having privileges on ships or other vessels, may pursue the vessel in the possession of any person who has obtained it by virtue of a sale; in this case, however, a distinction must be made between a forced and a voluntary sale."

ers and tugs. What was desirable and necessary to provide credit to seagoing trading vessels making long voyages to foreign ports in the French merchant fleet, has never been incorporated into the statutory law of Louisiana.

The Federal Maritime Lien Act of 1910, 46 U.S.C.A. §§ 971 through 975, and the Ship Mortgage Act of 1920, as amended, 46 U.S.C.A. §§ 911, 921–927, have effectively secured the same end in this country. To a great extent, these enactments supercede many of the privileges listed in the codal provision in question. However, a contract for construction of a vessel or ship is nonmaritime, and liens and privileges granted by state law for work, materials and other items are enforceable. See Daggett, Louisiana Privileges and Chattel Mortgages, 1942. Chapter IX, p. 532, at page 536, and authorities cited n. 26.

In Grant v. Fiol, 17 La. 158 (1841), the court had before it a claim made by a creditor who advanced money to the owner, which was used to pay privileged claims for supplies after the ship had made a voyage. The creditor sought to follow the vessel into the hands of a subsequent purchaser on the theory that he had been subrogated to the privileges accorded the debts so paid under Article 3204(8). Recovery was denied. The Court, with reference to the codal provision in question, however, said:

"The article referred to recognizes a privilege in sellers, those who furnished materials and workmen employed in the construction, *if the vessel has never made a voyage; and creditors* for supplies, etc., *previous to the departure of the ship, if she has already made a voyage.* The article contemplates two cases in which the privilege exists and points out the circumstances under which it must in each case be exercised; * * *." (Emphasis by the Court.)

This language emphatically recognizes the division of privileges created by Article 3204(8), now LSA–R.C.C. 3237(8).

As to those arising before the maiden voyage, they are generally classified as the sellers privilege, debts due for materials and debts due to workmen employed in the construction. It will be noted that the word "fournisseurs" in this classification is interpreted to mean "those who have furnished materials" in the English text of the Code of 1804, while in the second classification of debts arising after the maiden voyage the word "fournitures" is used, which means supplies, i. e., those goods usually furnished by ships' chandlers to a vessel in operation.

Again, Succession of Broderick, 12 La. Ann. 521 (1857), recognized the privilege existing in favor of those who furnish materials for the construction of the vessel. There, in holding that the privilege was lost by the lapse of sixty days under articles 3204 and 3212 of the Code of 1825, the Court said:

"But the engine, boilers and machinery sold by Knap & Wade were *part of the materials of the vessel, and formed a component part thereof. The privilege of Knap & Wade was a privilege under the 3204th Article of the Code, which was lost in sixty days after the materials were furnished.*" (Emphasis supplied. 12 La.Ann. 521, at p. 523.)

Bell v. Western Marine & Fire Insurance Co., 5 Rob. 423 (1843), presented a situation where the vendor of a vessel, holding a mortgage for the balance of the purchase price of the vessel (which was invalid under Louisiana Law at that time), was allowed to recover under a policy of fire insurance upon the vessel issued to him by defendant. The steamer burned shortly after the sale. In denying the defense that plaintiff had no insurable interest in the vessel, it was observed:

" * * * Admitting this to be true, then the privilege of the vendor remains, which creates an interest that can be insured. If the mortgage is invalid, it does not affect the privilege, which we think the vendor of a ship or steamboat has, in the same man-

ner as a vendor of other property. We do not think that they are a class of vendors excluded by the Code; on the contrary, *we think their rights are especially recognized by Art. 3204, No. 8."* (Emphasis supplied.)

Compare Terry v. Terry, 10 La. 68, (1836).

Finally, we consider the case heavily relied upon by both plaintiff and defendant, Graeme Spring & Brake Service, Inc. v. De Felice, 98 So.2d 314 (La.App. 1957). The facts are almost on all fours with the present situation. Defendant contracted with the C. & B. Steel Boat Construction Co., Inc., for the construction of a tug at a price of $60,000.00. In the course of the work, Graeme Spring supplied material and labor for their installation in the vessel. De Felice was a stranger to this transaction, and upon completion accepted delivery of the tug and paid the full contract price to C. & B. Thereafter, before making payment to Graeme, C. & B. filed proceedings for voluntary bankruptcy, and this suit, by Graeme against the purchaser, followed. The Court rejected Graeme's claim of privilege under LSA–R.S. 9:4502, as amended, which affords a privilege to manufacturers or repairmen of movable property of any type or description, holding that Graeme was neither a manufacturer nor a repairman in respect to the vessel. On rehearing, however, the court recognized the privilege granted by Article 3237(8) of the Code, as a furnisher of materials and of labor in the construction of the vessel, but remanded the case to determine if she had "made a voyage". This case is dispositive of the contention that such claims are not contemplated by LSA–C.C. 3237(8).

The foregoing cases, with many others in our jurisprudence growing out of the application of the codal provisions under

discussion, deal with completed vessels. It is conceded, however, that if the steel sold by Glazer to Safticraft had not been used, that is, changed from raw plate into the hull of a vessel, there would be no Hull No. 552, and the vendor's privilege under LSA–C.C. 3217(4) and 3227 would apply. When the keel was laid and Glazer's steel used in the construction of the vessel, this privilege was immediately lost, but that afforded by LSA–C.C. 3237(8) attached to the newly created object, which was, from its inception, designated as and destined to become a "vessel" within the meaning of that article.

■ Any other conclusion renders meaningless the entire concept of privileges on ships and other vessels under the Civil Code of this State. We concede the settled rule of Article 3185 of the Code that privileges are stricti juris and exist only where expressly granted by law. The cases applying this rule in all areas of the law dealing with privileges are legion and do not require citation. The interpretation we place on Article 3237(8), however, does not extend the rights granted thereby beyond the scope of the statute; it merely recognizes what is implicit in the wording used by the lawmakers at the time of its adoption, expressive of the legislative intent, considered in the background of the concept of privileged debts under the civil law.[6]

That the hull was considered as a "vessel" by Val-U Investment is expressly stated in the act of mortgage taken by it, upon which it relies. On page 4 of the supplemental brief filed in behalf of Val-U Investment on April 20, 1965, this description is set forth. We quote the pertinent parts as follows:

"One (1) seventy-foot twin screw *tugboat,* known as Hull No. 552 which said *Hull or Vessel* is presently * * *

6. Volumes have been written on privileges. They flow from the nature of the debt. LSA–C.C. Arts. 3186–3189 succinctly confirm these principles derived from Spanish, French and Roman sources, as fundamental concepts of Louisiana's civil law system. See Bourcier & Lanusse v. The

Ann, 1 Mart. (O.S.) 165 (1810), in re Red River Lines and Hyde v. Culver, supra n. 3. In the case of vessels, there is no doubt that the French codal provisions were carried although the Spanish influence prior to the Louisiana Code of 1825 is demonstrated by The Ann, supra.

in the course of construction ＊ ＊ ＊ together with all construction materials, steel, engines ＊ ＊ ＊ incorporated therein, it being the intention of the parties hereto that the lien and mortgage created hereby shall attach *to the entire vessel in the course of its construction ＊ ＊ ＊.*"

█ Recordation of the privilege predicated on LSA–C.C. 3237, which we recognize to apply in this case, is not required. Johnson Iron Works v. Moock, 5 Orl.App. 316 (1908); Graeme Spring & Brake Service v. De Felice, supra, (original opinion); Louisiana Constitution of 1921, Art. XIX, § 19. The articles creating the privilege make no such requirement.[7]

We now consider the question of whether or not the lien under which Glazer claims has been extinguished by prescription. LSA–C.C. 3237 provides that the prescription of six months applies. Our inquiry is primarily as to when the six months' period begins to run.

Construction began on the vessel in June of 1962. Glazer furnished steel for this purpose beginning with deliveries made June 14, and ending with deliveries made February 4, 1963. It remained in the possession of the bankrupt except for short periods of time when it was under seizure in the state courts in actions brought against Safticraft by other creditors. These seizures were dismissed. Glazer itself instituted suit in the State Court and obtained judgment against Saticraft for this debt on September 17, 1963, during the pendency of which suit the vessel was sequestered on June 28, 1963. The stipulation does not inform us when this suit was instituted. Val-U Investment made its loan to the debtor on September 12, 1962, after most of the

Glazer steel had been delivered and used. The hull was released from these seizures in favor of this bankruptcy proceeding. The petition for involuntary bankruptcy was filed on June 28, 1963, the debtor was adjudicated a bankrupt on September 24, 1963. The hull was sold by the Trustee, as we have noted.

Originally, the Code of 1825 fixed the running of prescription for such privileges with regard to whether or not the vessel had made a voyage. The six months' period was adopted by an act of the Legislature in 1858, and appears in LSA–C.C. 3237, set out above, in the concluding paragraph. Learned v. Brown, 94 F. 876 (5 Cir. 1899), concisely states the reasons underlying the adoption of the Act of 1858. Ships plying inland waters making short trips were not making "voyages" within the meaning of the Article. Resort was had to what was then Article 3212, now LSA–C.C. 3245, which provided that the ship is "considered to have made a voyage, when her departure from one port and arrival at another shall have taken place, or when, without having arrived at another, more than sixty days shall have elapsed between the departure and return to the same port ＊ ＊ ＊." The sixty-day period was held to constitute a voyage, consequently marking expiration of the privileges for debts arising following a change of ownership of the vessel. Thus a sixty-day period of prescription was applied to those claims listed in the codal article arising after the vessel left the builder and was put into operation. It was enlarged to a six months' period in 1858.

LSA–C.C. 3237(8), however, contemplates claims arising from things done or materials furnished before she has made any voyage, even during construction.[8]

---

7. This provision first appeared in the Louisiana Constitution of 1879, as Article 177. Under the Constitution of 1868, Article 123, all privileges were required to be recorded in order to affect third persons. Thus, in Rodd v. Heartt (The Lottawanna), 88 U.S. 558, 21 Wall. 558, 22 L.Ed. 654 (1875), and in many other earlier reported decisions dealing with

the Articles of the Civil Code granting privileges on vessels, a contrary result was reached.

8. Goirand, French Commercial Law, 2d Ed. 1898, p. 247 et seq. speaking of the modes of acquiring ownership of ships, leaves no doubt as to this. We quote:

"By virtue of the construction of the ship—The construction of a vessel gives

So far as we can determine, there are no reported cases in Louisiana where the vessel was sold *prior to completion*.

■ It will be noted that these privileges are conferred on the *price* of the vessel. LSA–C.C. Article 3237, supra, and Articles 3243, 3244 and 3245 [9] would lead us to the conclusion that in cases of privileges growing out of original construction, the prescriptive period of six months does not commence to run until after the vessel is completed and delivered or "sold" to the owner, especially in a situation such as the one before us. Safticraft was in the ship building business, and it appears from the stipulation and attached exhibits that the vessel in question was being constructed under contract for one Cheramie. In this view, so long as the vessel remained in the hands of the ship builder, the six months' period of prescription would not commence to run.

It is only after delivery, followed by the default of the ship builder to the furnisher of materials used in construction of the vessel, that the latter's exercise of his rights on the price of the ship becomes necessary for the preservation of the privilege granted him, and he must act within six months or before the vessel is permitted to make a voyage. Only then is the privilege lost.

■ The determination of this question, however, is not necessary for our decision in this case. It is agreed that the steel was furnished under a specific agreement for this particular vessel which continued from June, 1962 until February 4, 1963. This fixes the date of conclusion of performance of the obligation giving rise to the privileged debt. Suit was filed for recognition of the lien on or before June 28, 1963, well within the six months' period, and judgment rendered in that proceeding recognizing the privilege on September 17, 1963. Under the express provisions of LSA–C.C. 3518 and the holding of the court in Graeme Spring and Brake Serv-

rise, between owner, constructor, outfitters, carpenters, and other workmen, to contracts, similar to those which take place between owner, builder, architect, and masons for the construction of a house.

Formerly, the shipowner was himself the builder of his vessel, and treated directly with the tradesmen, outfitters, and workmen. This mode of construction was termed 'construction par economie.'

At the present day this mode of construction is seldom employed except by those who build ships for sale.

Owing to the present increased cost of construction, the shipowner generally builds his ships through a contractor; he makes a bargain with the contractor, who in turn makes his terms with the workmen.

Two cases must be distinguished: in the first the shipowner supplies the materials, and the builder only the manual labour; in the second, the builder furnishes both the materials and the labour. In the former case, the contract entered into by the parties is a louage d'industrie, or hiring of labour; in the latter case, the question is undecided. Nevertheless, the prevailing opinion, supported by the Court of Cassation, is that the bargain for the vessel is a contract of *sale on delivery*. *The builder, even if he has received pay-* *ments on account, remains proprietor until delivery.*" (Emphasis supplied.)

9. LSA–C.C. Articles 3243, 3244 and 3245 read as follows:

"Art. 3243. But when the ship has made a voyage in the name and at the risk of the purchaser, without any claim on the part of the privileged creditors of the vendor, these privileges are lost and extinct against the ship, if she was in port at the time of sale."

"Art. 3244. On the other hand, if the ship was on a voyage at the time of sale, the privilege of the creditor against the purchaser shall only become extinct after the ship shall have returned to the port of departure, and the creditors of the vendor shall have allowed her to depart on another voyage for the account and risk of the purchaser, and shall have made no claim."

"Art. 3245. A ship is considered to have made a voyage, when her departure from one port and arrival at another shall have taken place, or when, without having arrived at another, more than sixty days have elapsed between the departure and return to the same port; or when the ship, having departed on a long voyage, has been out more than sixty days, without any claim on the part of persons pretending a privilege."

ice v. De Felice, supra, this interrupted the running of prescription and secured Glazer's privilege. Cf. Johnson Iron Works v. Moock, supra.

Hence, even under the view most favorable to Val-U Investment, the plea of prescription must be resolved against it. When the mortgage was confected on September 12, 1962, Glazer's privilege had come into being and even at that time the vessel was burdened with a privileged debt which finally totalled $15,672.51. Val-U contented itself with the declaration of the bankrupt that there were no unpaid debts due on the subject of its mortgage. The mortgage so taken covered only the builder's equity in the vessel in question.

For the foregoing reasons, the order of the Referee is reversed. The cause is remanded for further proceedings not inconsistent with the views herein expressed. Counsel for petitioner, Glazer Steel Corporation, will prepare and submit an appropriate decree pursuant to Rule 9 (e), Western District of Louisiana.