IN RE ASSIGNMENT FOR BENEFIT OF CREDITORS OF MADER'S STORE FOR MEN, INC.: GELATT, Appellant, v. DEDAKIS, Respondent.

*No. 75–32. Argued November 29, 1976.—Decided May 17, 1977.*
(Also reported in 254 N. W. 2d 171.)

For the appellant there was a brief by *L. E. Sheehan* and *Moen, Sheehan & Meyer, Ltd.*, and oral argument by *Paul W. Henke, Jr.*, all of La Crosse.

For the respondent there was a brief and oral argument by *N. George DeDakis* of La Crosse.

ABRAHAMSON, J.   Two questions are presented on this appeal: First, whether the provisions of ch. 128, Stats., relating to the appointment of a receiver for an insolvent corporation have been suspended by the national Bankruptcy Act, Title 11, U.S.C.A. Second, whether in this ch. 128 proceeding, the claim of James S. Gelatt, an officer-shareholder, for advances made to his corporation was properly subordinated to the claims of other general creditors on the theory that the advances, though in form loans, were in substance contributions to capital.

## I.

Mader's Store for Men, Inc., was in the retail clothing business in La Crosse, Wisconsin, from March 28, 1966 through October 8, 1973, when its assets were sold to Dad's & Lad's of La Crosse, Inc., in a bulk transfer pursuant to ch. 406, Stats. On October 4, 1973, four days before the sale, the instant proceedings were commenced in the circuit court for La Crosse county upon the complaint of a creditor of Mader's, Gant Shirt Makers Division of Consolidated Foods Corp., a Maryland corporation. In its complaint and supporting affidavit Gant alleged that Mader's was indebted.to it for $8,491.22; that Mader's was insolvent or was in imminent danger of insolvency; that Mader's had sent to its creditors notice of a bulk sale of its assets to Dad's & Lad's of La Crosse, Inc.; that the address shown for Dad's & Lad's was the same as the address of Mader's; that the notice provided that proceeds of the sale would not be used to pay Mader's debts as they matured; that the notice stated that the transfer would be for $5,000 new consideration plus the cost price of inventory, which price had not been determined; that Mader's debts were estimated at $157,-680; and that unless immediate steps were taken to protect general creditors such as Gant any interest which should in equity flow to them by reason of the sale would be dissipated. In its complaint Gant prayed that the court sequestrate the property and assets of Mader's and appoint a receiver to administer the assets in accordance with ch. 128, Stats.

Based upon the complaint and affidavit, the circuit court signed an order restraining Mader's from alienating or disposing of any assets except in the usual course of business and directing Mader's to show cause on October 8, 1973, why a receiver should not be appointed. Thereafter Gant and Mader's entered into a stipulation to

the effect that the restraining order might be dissolved and the bulk transfer consummated as planned, and to the further effect that N. George DeDakis, who was attorney for Gant, might be appointed receiver and in that capacity have delivered to him the proceeds of the bulk sale. An order corresponding to the stipulation was signed by the circuit court on October 8, 1973, and the sale apparently was closed the same date, as had been planned.

Some 36 claims were eventually filed with the receiver, totalling approximately $149,000 (excluding costs of administration). Of this amount $141,069 was claimed by unsecured general creditors. The receiver reported that he had available to pay claims $36,030 cash and accounts receivable totaling $8,186. The receiver objected to several of the claims filed, including the claim of James S. Gelatt, Jr., for $49,250 principal and interest on four loans made by him to Mader's between May of 1971 and December of 1972. An objection was also filed to the claim of Robert L. Hurtgen for $8,512 due on a $15,000 loan made to the corporation in January of 1973. At the time the claimed loans were made Gelatt and Hurtgen each owned half of Mader's outstanding stock, and each was an officer and a director of the corporation. As to both the Gelatt and Hurtgen claims the trial court concluded, after a hearing, that although the advances for which claim was made were in fact made to and used by the corporation, and although neither of the claimants were shown to have acted in bad faith in respect of their dealings with the corporation, the advances were in substance contributions to capital rather than loans. The trial court entered an order subordinating the claims of both men to the claims of other general creditors. From this order Gelatt has taken the instant appeal.

## II.

Gelatt's first contention is that the provisions of ch. 128, Stats., relating to the involuntary appointment of a receiver over the property of an insolvent corporation have been suspended by the national Bankruptcy Act, Title 11, U.S.C.A. Sec. 128.08 (1), Stats., provides:

"The court within the proper county may sequestrate the property of a debtor and appoint a receiver therefor:

"(a)  When an execution against a judgment debtor is returned unsatisfied in whole or in part.

"(b)  When a corporation has been dissolved or is insolvent or is in imminent danger of insolvency or has forfeited its corporate rights."

The contention is that by virtue of the asserted suspension of the statute the circuit court was here without jurisdiction to enter the order subordinating Gelatt's claim or to otherwise act in the matter. This issue is raised for the first time on appeal. The receiver argues that the statutes are not suspended by the national Act, and further urges that Gelatt has waived objection to the validity of the receivership proceedings by virtue of his participation therein.

In *Home Bank v. Becker,* 48 Wis.2d 1, 179 N.W.2d 855 (1970), cited by the receiver, the debtor moved in the trial court to have the order appointing a receiver under ch. 128 set aside. This court held that objections based upon the creditor's failure to exhaust legal remedies, inadequacy of the petition, and insufficiency of the receiver's bond were waived because not timely raised. The debtor had appeared at the hearing on the order to show cause why a receiver should not be appointed, had filed a schedule of creditors and an inventory, and had sat by while her creditors' claims were approved and her property sold, all without objecting to the receiver's appointment.

In the instant case it is a creditor, rather than the debtor, as in *Home Bank,* who is challenging the receivership. A creditor entering receivership proceedings after the receiver is appointed is not bound by previous conduct of others constituting a waiver, but if the creditor subsequently participates in the proceedings his right to object may be waived. In the context of an assignment for the benefit of creditors, this court has held that a creditor's filing and proving his claim was a waiver of objections to the validity of the assignment and the authority of the court to restrain creditors from proceeding independently against assets in the hands of the assignee. *In re Assignment of Gilbert,* 94 Wis. 108, 68 N.W. 863 (1896) ; *Littlejohn v. Turner,* 73 Wis. 113, 40 N.W. 621 (1888).

In the instant case Gelatt filed his claim with the receiver and successfully petitioned the court for an extension of the time for filing claims. He participated in the proceedings regarding adjudication of the receiver's objection to his claim, submitting evidence to support the validity of the claim. He joined in the stipulated statement of facts upon which the circuit court largely based its decision. All of this was done without objecting in any way to the validity of the proceedings.

Gelatt clearly has waived his right to assert most objections to the validity of the receivership. However, it is fundamental that parties cannot confer subject matter jurisdiction upon a court by waiver or consent. The United States Supreme Court has characterized proceedings under suspended state insolvency legislation as "utterly null and void," *Straton v. New,* 283 U.S. 318, 327, 51 S. Ct. 465, 75 L. Ed. 1060 (1931), and subject to collateral attack, *International Shoe Co. v. Pinkus,* 278 U.S. 261, 49 S. Ct. 108, 73 L. Ed. 318 (1929). If Gelatt is correct in asserting that the receivership provisions

of ch. 128 are suspended, and if the jurisdiction of the circuit court depended thereon, subject matter jurisdiction would be absent. To that extent Gelatt's claims must be considered notwithstanding his participation in the receivership without complaint.[1]

Disposition of Gelatt's contentions requires a brief consideration of the history of ch. 128, Stats.

As originally constituted, ch. 128, Stats., was entitled "Voluntary Assignments," and dealt almost entirely with that subject. It contained elaborate procedures whereby any person who had made a voluntary assignment for the benefit of creditors could obtain a discharge from his debts. Secs. 128.19–128.29, Stats. 1925. In *Voluntary Assignment of Tarnowski,* 191 Wis. 279, 210 N.W. 836 (1926), this court held that the discharge provisions of the chapter were suspended by the Bankruptcy Act, but determined that they could be severed so as to leave the remainder of the chapter in force. As so construed ch. 128 was upheld by the United States Supreme Court in *Pobreslo v. Joseph M. Boyd Co.,* 287 U.S. 518, 53 S. Ct. 262, 77 L. Ed. 469 (1933), affirming this court's decision at 210 Wis. 20, 242 N.W. 725 (1932). The United States Court said:

"In the case now before us the Wisconsin statutory provisions relating to discharge of insolvent debtors were not invoked. There is nothing in the assignment, the application to the circuit court to take jurisdiction, or its order thereon, to suggest that the discharge of the assignor was contemplated. The provisions regulating the administration of trusts created by voluntary assignments for the benefit of creditors apply whether the assignor is solvent or insolvent. They do not prevent creditors from bringing action against the debtor or require those seeking to participate in the distribution

---

[1] The fact that subject matter jurisdiction is at issue also renders inapplicable the rule that this court will not generally consider the constitutionality of a statute if raised for the first time on appeal. *See State v. Weidner,* 47 Wis.2d 321, 323, 177 NW2d 69 (1970).

of the estate to stipulate for his discharge. And, quite in harmony with the purposes of the federal Act, the provisions of c. 128 that are regulatory of such voluntary assignments serve to protect creditors against each other and go to assure equality of distribution unaffected by any requirement or condition in respect of discharge.

"... .

"[A]s proceedings under any such assignment may be terminated upon petition of creditors filed within the time and in the manner prescribed by the federal Act (*West Company v. Lea,* 174 U.S. 590), it is apparent that Congress intended that such voluntary assignments, unless put aside, should be regarded as not inconsistent with the purposes of the federal Act . . . ." 287 U.S. at 525, 526.

Chapter 128 was substantially modified by ch. 431, Laws of 1937, which added, in sec. 128.06, an involuntary "action for the appointment of a receiver and for administration."[2] Sec. 128.08, Stats. 1937, provided that

[2] Sec. 128.06, Stats. 1937, provided in part as follows:

"128.06 Involuntary proceedings. (1) An action for the appointment of a receiver and administration under the provisions of this chapter may be commenced by two or more of his creditors owning claims of not less than two hundred dollars in the aggregate against an insolvent debtor whenever such debtor shall have within four months prior to the commencement of such action:

"(a) Conveyed, transferred, concealed or removed, or permitted to be concealed or removed, any part of his property with intent to hinder, delay or defraud his creditors, or any of them; or

"(b) Transferred, while insolvent, any portion of his property to one or more of his creditors with intent to prefer such creditors over his other creditors; or

"(c) Suffered or permitted, while insolvent, any creditor to obtain a lien through legal proceedings, and not having at least five days before a sale or final disposition of any property affected by such lien vacated or discharged such lien; or

"(d) Made a fraudulent or collusive assignment for the benefit of his creditors; or

"(e) Admitted in writing his inability to pay his debts and his willingness to be adjudged insolvent on that ground.

"(2) If the debtor denies any of the allegations of the petition, he shall appear in court on the hearing, with his books, papers and

a receiver might be appointed for the property of the debtor when a petition under sec. 128.06 had been filed and when an execution against a domestic corporation had been returned unsatisfied in whole or in part. Procedures for administration of the debtor's property were specified in detail, priorities of distribution were established, and the receiver was given the status of a creditor armed with process, was subrogated to the rights of creditors for the benefit of the estate, and was empowered to avoid certain preferences given by the debtor within the four-month period preceding the filing of an assignment for the benefit of creditors or a petition under sec. 128.06. Detailed provision was made for the invalidation of levies, judgments, attachments and other liens obtained during this four-month period.

In its amended form ch. 128 was again claimed to be suspended by the Bankruptcy Act in *In re Wisconsin Builders Supply Co.*, 239 F.2d 649 (7th Cir. 1956), a case which arose from the attempts of a trustee in bankruptcy to reach assets in the hands of a state court receiver appointed more than four months before the petition in bankruptcy was filed. The Court of Appeals conducted a section-by-section comparison of the amended chapter with the former provisions of ch. 128 that had been upheld by the United States Supreme Court in *Pobreslo, supra*. The court concluded that as to proceedings instituted by a voluntary assignment for the benefit of creditors, as the proceedings then had been, ch. 128 was substantially a reenactment of the earlier

accounts, and submit to an examination, and in case of his failure to do so the burden of proving his solvency shall rest upon him.

"(3) Upon the commencement of the action the court shall promptly set a date for a hearing on notice to the plaintiffs and the debtor. At the hearing any intervening creditors, as well as the plaintiffs and the debtor, shall be heard, and the court without the intervention of a jury shall determine the issues and either make an order adjudging the debtor to be subject to the proceedings under this chapter, or dismiss the proceedings."

law and had not been "turned into a system of insolvency administration opposed to the Bankruptcy Act . . . ." 239 F.2d at 656. However, the court stated in dicta that the involuntary action created by sec. 128.06, note 2, *supra,* conflicted with the Bankruptcy Act and was thereby suspended. Its conclusion rested on the fact that sec. 128.06 was much broader in scope than the limited involuntary provision found in ch. 128 at the time *Pobreslo* was decided,[3] and was in fact "as broad and

---

[3] Sec. 128.08, Stats 1929, provided:

"When any debtor, being insolvent, shall confess judgment or do any act or make any conveyance whereby one or more of his creditors shall obtain a preference over any other of his creditors or shall omit to do any act which he might lawfully do to prevent any of his creditors from obtaining preference over his other creditors, contrary to the intent of this chapter, or if he shall not, within ten days after any levy by attachment, execution or garnishment made against him, make an assignment of all his property, as provided in the next foregoing section, or within such time in good faith institute proceedings to vacate the attachment, execution or garnishment, or secure a release of such levy or defend against the said levy, then, or within thirty days thereafter, any two or more of his creditors holding and owning debts or claims of not less than two hundred dollars in the aggregate may make a petition to the circuit court or a judge thereof in the county or circuit where such debtor resides, if a resident of this state, and if not, in any county thereof, setting forth therein such matters and facts as may be pertinent, and after notice given in such manner as the court or judge may direct to the debtor and creditors sought to be preferred or to their attorney of record, of the time and place of hearing, the court in term time or a judge in vacation shall proceed summarily upon such petition to hear the parties and receive such evidence as may be proper, and if it shall appear to the court or judge that the debtor is insolvent and has given a preference to any of his creditors over other of his creditors or any of them, or has refused or neglected to make an assignment of his property as hereinbefore provided, the court or judge shall appoint a receiver who shall take possession of all the debtor's property, evidences of property or indebtedness, books, papers, debts, choses in action and estate of every kind, including property attached or levied upon or garnished in the manner and subject to the limitations herein provided and of all property conveyed in violation of the provisions

comprehensive" as sec. 3 of the federal Act, 11 U.S.C. sec. 21.[4]

In response to the *Wisconsin Builders Supply* decision the legislature, by ch. 274, Laws of 1957, repealed sec. 128.06, Stats., and amended sec. 128.08, Stats., to provide in part as follows:

"(1) The court within the proper county may sequestrate the property of a debtor and appoint a receiver therefor:

"(a) When an execution against a judgment debtor is returned unsatisfied in whole or in part.

"(b) When a corporation has been dissolved or is insolvent or is in imminent danger of insolvency or has forfeited its corporate rights."

It is the contention of Gelatt that in authorizing the involuntary appointment of a receiver for an insolvent corporation, sub. (b) conflicts with the Bankruptcy Act and is suspended. We disagree.

---

of this chapter, and have charge and control of the same, and of all debts or property garnished, except property exempt by law, and convert the same into money and distribute the same pro rata among the creditors having valid claims due or to become due who shall prove their claims within such time and manner as the court or judge shall direct; and the court or judge shall order the debtor to file a correct inventory of his assets and a list of his creditors as provided in section 128.13; such receiver shall be appointed and all proceedings shall be had under these statutes relating to receivers, and the court or judge may order or direct such debtor to do or refrain from doing whatsoever is necessary and proper to carry this chapter into effect. The provisions of this chapter shall not apply to any payment or satisfaction, in whole or in part, of a past-due debt made in the usual course of business without any intent on the part of the creditor to evade the same. The same proceedings may be taken and with like effect under the provisions of this section by such insolvent debtor for a discharge from his indebtedness as if said debtor had made a voluntary assignment under this chapter."

[4] 11 USCA sec. 21(a) defines the six acts of bankruptcy, five of which had substantially identical counterparts in the acts enumerated in sec. 128.06(1), Stats. 1937. The same four-month period of limitations applied under both statutes as well.

In authorizing the appointment of a receiver for an insolvent corporation, this statute creates no new remedy or jurisdiction. It is merely declaratory of an authority long held to be within the inherent equitable powers of our courts. *See Hazelwood v. Third & Wells Realty Co.,* 205 Wis. 85, 89, 236 N.W. 591 (1931) ; *Fondtosa Highlands, Inc. v. Paramount Development Co.,* 212 Wis. 163, 171, 248 N.W. 131 (1933) ; *Lehr v. Murphy,* 136 Wis. 92, 99, 116 N.W. 893 (1908).[5] It cannot be contended that the Bankruptcy Act put an end to the powers of courts of equity in this regard, *Hazelwood, supra,* nor that statutes declaring or regulating this power are generally suspended by the Bankruptcy Act. *Stevens v. Carolina Scenic Stages,* 208 F.2d 332 (4th Cir. 1953), *cert. den.* 347 U.S. 917; *Gallagher v. Keystone Realty Holding Co.,* 333 Pa. St. 9, 3 A.2d 426 (1939) ; *In re Distillers Factors Corp.,* 187 F.2d 685 (3d Cir. 1951). We note that in *In re Watts & Sachs,* 190 U.S. 1, 23 S. Ct. 718, 47 L. Ed. 933 (1903), the United States Court had before it a state statute such as sec. 128.08(1)(b), Stats., with no suggestion made that the statute was invalid. We note also that today, after nearly eighty years in which bankruptcy legislation has continuously been in force, statutes declaring or regulating in greater or lesser detail the power of courts of equity over insolvent corporations

---

[5] *See also Harrigan v. Gilchrist,* 121 Wis. 127, 244, 245, 99 N.W. 909 (1904), where the court said:

"Can there be any doubt that, if there were no statutory aid in the matter, courts of equity would have power to deal with any kind of a trust fund, effectively protecting the interests of all parties therein, and in a single action bringing all of them before the court? . . . There was and is a judicial remedy in equity to enforce a trust in favor of creditors respecting the property of an insolvent corporation, and in aid thereof we have the sequestration remedy afforded by the statute. This court early took most advanced ground on the subject of whether the equity power of the court in such matters was dependent upon the statute." 121 Wis., at 244, 245.

remain on the books and in use in many if not most of the several states.

It is apparent from the Bankruptcy Act itself that the states retain considerable freedom of action with respect to insolvent debtors. The fifth act of bankruptcy consists of a person's having

"While insolvent or unable to pay his debts as they mature, procured, permitted, or suffered voluntarily or involuntarily the appointment of a receiver or trustee to take charge of his property." 11 U.S.C.A. sec. 21(a) (5).

Sec. 2a(21) of the Act authorizes the bankruptcy courts to require delivery to the trustee in bankruptcy of assets in a state court receiver's hands, provided the receiver was not appointed more than four months before the date of bankruptcy.[6] In our opinion, these provisions reflect a congressional intent generally to preserve the validity of receiverships, whether voluntary or involuntary, created under state law, unless and until such proceedings are displaced pursuant to sec. 2a(21) by proceedings in a court of bankruptcy.

---

[6] Sec. 2a of the Act, 11 U.S.C.A. sec. 11(a) provides in part as follows:

"(a) The courts of the United States hereinbefore defined as courts of bankruptcy . . . are invested . . . with such jurisdiction at law and in equity as will enable them . . . to

". . .

"(21) Require receivers or trustees appointed in proceedings not under this title, assignees for the benefit of creditors, and agents authorized to take possession of or to liquidate a person's property to deliver the property in their possession or under their control to the receiver or trustee appointed under this title . . . and in all such cases to account to the court for the disposition by them of the property of such bankrupt or creditor: *Provided, however*, that such delivery shall not be required, except in proceedings under section 205 and chapter 10 and 12 of this title, if the receiver or trustee was appointed, the assignment was made, or the agent was authorized more than four months prior to the date of bankruptcy. . . ."

As was said in *Gallagher v. Keystone Realty Holding Co., supra,* 3 A.2d at 428:

"The Insolvency Act is not inconsistent with the Bankruptcy Act, 11 U.S.C.A. sec. 1 et seq., merely because it authorizes appointment of a receiver in the circumstances alleged. . . . Congress recognized the right of a state court to appoint a receiver by providing in the Bankruptcy Act [quoting sec. 2a(21), *supra*]. In construing a state insolvency law regulating assignments for the benefit of creditors the court, in Pobreslo v. Joseph M. Boyd Co., 287 U.S. 518, 526, 53 S. Ct. 262, 77 L. Ed. 469, said: 'And as proceedings under any such assignment may be terminated upon petition of creditors filed within the time and in the manner prescribed by the federal act (George M. West Company v. Lea, 174 U.S. 590, 19 S. Ct. 836, 43 L. Ed. 1098), it is apparent that Congress intended that such voluntary assignments, unless so put aside, should be regarded as not inconsistent with the purposes of the federal act.' . . . If for the supreme court's words 'proceedings under any such assignment,' we substitute 'proceedings under the state court receivership' it would seem equally apparent that Congress intended such receivership proceedings 'unless so put aside, should be regarded as not inconsistent with the purposes of the federal act.'

"Congress made certain exceptions from what might otherwise have been an all embracing statute; within the field of those exceptions the state's power to legislate remained unimpaired as the case just cited shows. In that field the state insolvency act is in force and regulates the administration of insolvent estates until and unless the bankruptcy court on appropriate application takes over the administration of the estate. . . the assignment for the benefit of creditors has been recognized as valid ever since the Act was passed in 1898 though, under the conditions specified in the Act, such assignment might furnish the ground for involuntary proceedings in bankruptcy displacing further administration under the state law; when the amendment of 1938 (supra) dealt with 'receivers or trustees appointed in proceedings not under this title' etc., the power of the state court to appoint receivers was likewise recognized, subject, as in the case of assignments, to subsequent action under the federal law. . . ."

That state receiverships are generally valid (unless and until displaced) does not of course exclude the possibility that the incidents of particular proceedings involving a receivership might raise a conflict with the national Act. *Cf. Emil v. Hanley,* 318 U.S. 515, 520 (1943). It is settled in this regard that state statutes providing for the discharge of a debtor, or exacting from creditors a stipulation of discharge as a condition of participating in the distribution of the debtor's assets, are invalid so long as national legislation is in effect. *International Shoe Co. v. Pinkus,* 278 U.S. 261, 49 S. Ct. 108, 73 L. Ed. 318 (1929); *Voluntary Assignment of Tarnowski,* 191 Wis. 279, 210 N.W. 836 (1926). It also appears to be generally conceded that the presence or absence of a discharge provision is not the sole determining criterion.[7] However, what the additional criteria are or ought to be is a matter of considerable confusion and uncertainty. Courts and commentators have been led into a variety of efforts to define the essence of bankruptcy legislation, the premise being that state laws which are "tantamount to bankruptcy" are suspended.[8]

[7] A number of decisions in the lower federal courts have held legislation in respect of insolvents to have been suspended notwithstanding the absence of discharge provisions. *See* for example, *In re Wisconsin Builders Supply Co.,* 239 F.2d 649 (7th Cir. 1956); *First National Bank of Albuquerque v. Robinson,* 107 F.2d 50 (10th Cir. 1939); *In re Weedman Stave Co.,* 199 F. 948 (E.D. Ark. 1912); *In re Smith,* 92 F. 135 (D. Ind. 1899).

In *Stellwagen v. Clum,* 245 U.S. 605, 616, 38 S. Ct. 215, 62 L. Ed. 507 (1918), the court said:

"[W]hile it is not necessary to decide that there may not be state insolvent laws which are suspended although not providing for a discharge of indebtedness, all the cases lay stress upon the fact that one of the principal requisites of a true bankruptcy law is for the benefit of the debtor in that it discharges his future acquired property from the obligation of existing debts."

[8] A number of proposed tests are collected in a note at 14 Rutgers L. Rev. 800 (1960). *See also* Comment, *A Challenge to the Validity of Certain Sections of Wisconsin's Chapter 128,* 45 Marq.

The results have not been satisfactory; after a period of nearly eighty years in which national bankruptcy legislation has been continuously in effect, the doctrinal basis of the distinction sought to be drawn remains unclear.

Some of the uncertainty in the area is traceable to the sweeping language used by the United States Supreme Court in *International Shoe Co. v. Pinkus, supra.*[9] Courts have examined state legislation with an eye to determining whether it "occupies the same field" as the federal Act or offers a competitive alternative thereto.[10]

L. Rev. 403 (1962); McCarty, *Federal Bankruptcy or State Court Receivership*, 48 Marq. L. Rev. 340, (1965); Williston, *The Effect of a National Bankruptcy Law Upon State Laws*, 22 Harv. L. Rev. 547 (1909).

[9] ". . . In respect of bankruptcies the intention of Congress is plain. The national purpose to establish uniformity necessarily excludes state regulation. It is apparent, without comparison in detail of the provisions of the Bankrutcy Act with those of the Arkansas statute, that intolerable inconsistencies and confusion would result if that insolvency law be given effect while the national Act is in force. Congress did not intend to give insolvent debtors seeking discharge, or their creditors seeking to collect claims, choice between the relief provided by the Bankruptcy Act and that specified in state insolvency laws. States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations. [citations] It is clear that the provisions of the Arkansas law governing the distribution of property of insolvents for the payment of their debts and providing for their discharge, or that otherwise relate to the subject of bankruptcies, are within the field entered by Congress when it passed the Bankruptcy Act, and therefore such provisions must be held to have been superseded. [278 U.S. at 265, 266]

". . .

". . . The enforcement of state insolvency systems, whether held to be in pursuance of statutory provisions or otherwise, would necessarily conflict with the national purpose to have uniform laws on the subject of bankruptcies throughout the United States." *Id.* at 268.

[10] *See* for example *First National Bank of Albuquerque* and *In re Wisconsin Builders Supply Co.*, note 7, *supra*.

However, in *Pobreslo v. Joseph M. Boyd Co.*, 287 U.S. 518, 53 S. Ct. 262, 77 L. Ed. 469 (1933), a case decided after *Pinkus, supra,* the court upheld the provisions governing assignments for the benefit of creditors then contained in ch. 128, Wis. Stats., noting in the process that if creditors of the corporation so desired, they could put an end to the state assignment proceedings by instituting bankruptcy proceedings within the statutory four-month period. An assignment for the benefit of creditors results in the ratable distribution of non-exempt assets of an insolvent debtor among his creditors just as do proceedings in bankruptcy, and the bankruptcy court is available, as an alternative to the assignment proceedings, to the debtor and in most cases to his creditors as well. It is apparent that state legislation does not encroach in a forbidden way upon the field occupied by the Bankruptcy Act merely because it provides for a distribution of the assets of an insolvent corporation among its creditors, and we think this is true whether the proceeding is voluntary or involuntary in its inception. *Pinkus* must be read in the light of the *Pobreslo Case,* and the fact that the condemned Arkansas statutes provided for discharge of the debtor.

Both before and after the *Pinkus* decision, the United States Supreme Court has said that state legislation is suspended "only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress." *Stellwagen v. Clum,* 245 U.S. 605, 613, 38 S. Ct. 215, 62 L. Ed. 507 (1918) ; *Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Building Corp.,* 302 U.S. 120, 126, 58 S. Ct. 125, 82 L. Ed. 147 (1937). In our opinion the appropriate focus of analysis is the effect of operation of the challenged state laws upon access of the debtor or his creditors to the bankruptcy courts, administration of proceedings therein, and rights and liabilities created by the federal Act.

"[T]he basic impropriety to be avoided in state insolvency legislation is interference with the orderly administration of the constitutionally authorized uniform national bankruptcy laws." *In re Distillers Factors Corp., supra,* 187 F.2d at 687.

We think it clear that no improper interference with the operation of the federal Act is created or permitted by the provisions of ch. 128.

We conclude that ch. 128 has not been suspended by operation of the Bankruptcy Act. However, even if this were not true Gelatt's jurisdictional challenge must be rejected. As we have already indicated, the power to appoint a receiver for an insolvent corporation is an inherent aspect of equity. In *Hazelwood v. Third & Wells Realty Co., supra,* 205 Wis. at 89, it was said:

". . . The plaintiff Hazelwood was appointed as receiver of an insolvent corporation. This is a power inherent in equity courts and does not depend for its vitality upon any provision of the statute. The procedure in cases of this kind is regulated by secs. 286.10 and 286.11, Stats. These sections, however, do not create the remedy. It cannot be contended that the enactment of the federal Bankruptcy Act suspended the power of courts of equity in the several states. No provision is made anywhere for the discharge of an insolvent in proceedings of the kind instituted in this case. So that, in any event, the plaintiff might properly have maintained this action."

It is true that the receiver in *Hazelwood* was appointed at the suit of a judgment creditor and that in the absence of a statute a creditor who has not reduced his claim to judgment normally may not secure the appointment of a receiver. *Hinckley v. Pfister,* 83 Wis. 64, 82, 53 N.W. 21 (1892) ; 1 *Clark on Receivers,* secs. 187, 190 (3d ed. 1959). Gant Shirt Makers was not a judgment creditor of Mader's. However, the rule requiring exhaustion of

legal remedies has not been applied with blind rigidity in the case of insolvent corporate debtors. 1 *Clark, supra,* sec. 187(b) ; 16 Fletcher, *Corporations,* sec. 7692 (1962). The possibilities for fraud upon creditors inherent in bulk transfers and the potential need for immediate action to prevent dissipation of the proceeds have been recognized.[11] We think it clear that under the circumstances present in the case at bar a court of equity might have appointed a receiver independent of any statute on the subject. But whether this is so or not, the fact that a receiver has been appointed at the instance of a simple contract creditor is not a jurisdictional defect. It is at most an error which may be waived by participating in the receivership as Gelatt has done. 16 Fletcher, sec. 7692; 1 Clark, *supra,* sec. 188(d).

---

[11] Weintraub & Levin, *Bulk Sales Laws and Adequate Protection of Creditors,* 65 Harv. L. Rev. 418, 419, 436–439 (1952). Bulk sales are currently regulated by Article 6 of the Uniform Commercial Code. The official Comment to U.C.C. sec. 6–101 states in part:

"2. Many states have bulk sales laws, of varying type and coverage. Their central purpose is to deal with two common forms of commercial fraud, namely:

"(a) The merchant, owing debts, who sells out his stock in trade to a friend for less than it is worth, pays his creditors less than he owes them, and hopes to come back into the business through the back door some time in the future.

"(b) The merchant, owing debts, who sells out his stock in trade to anyone for any price, pockets the proceeds, and disappears leaving his creditors unpaid.

". . .

"4. The second form of fraud suggested above represents the major bulk sales risk, and its prevention is the central purpose of the existing bulk sales laws and of this Article. Advance notice to the seller's creditors of the impending sale is an important protection against it, since with notice the creditors can take steps to impound the proceeds if they think it necessary."

(No intimation that fraud was in fact contemplated in the case at bar is intended.)

## III.

We now turn to the question of whether under the circumstances the trial court was justified in subordinating Gelatt's claim to the claims of other general creditors.

Mader's Store for Men, Inc., entered the retail clothing business in March, 1966. At the outset the stated capital of the corporation was $15,000, all of which had been paid in by Robert L. Hurtgen, then the sole shareholder, president and director of the corporation. Additional funds were provided by a bank loan of $25,000, guaranteed by Hurtgen, and by a loan from Hurtgen personally in approximately the same sum. Hurtgen's loan was repaid within the first several years of the store's operation. The bank loan was refinanced several times, and additional loans and partial repayments were made, such that at the time the receiver was appointed Mader's owed the bank $35,000.

Gelatt first became involved with Mader's on September 30, 1970. On that date the corporation issued new stock to Gelatt, for which he paid $50,000 cash, becoming the owner of half the outstanding shares. Gelatt became a director and was elected vice-president and secretary of the corporation. Gelatt never drew a salary, and was not involved in the day-to-day operation of the store, that remaining Hurtgen's responsibility, although it appears that Gelatt was active in management decisions.

Gelatt began advancing money to the corporation in May of 1971, his advances ultimately totaling $45,000 by December of 1972.[12] It appears from the record that the sums advanced were used principally to pay bills for merchandise needed for the La Crosse and Menomonie

---

[12] The dates and amounts of the advances were as follows:

| | |
|---|---|
| May 26, 1971 | $20,000.00 |
| October 18, 1971 | 5,000.00 |
| October 20, 1971 | 5,000.00 |
| December 18, 1971 | 15,000.00 |

stores. The advances were carried on the books of the corporation as loans, and were evidenced by unsecured demand notes carrying interest of six percent per annum. The corporate minutes disclose authorizations for the corporation's borrowing the sums in question from Gelatt. It was stipulated by the parties that "the banks probably would not have loaned money to the corporation" at the times when Gelatt's advances were made.

The corporation lost money in every year of its existence, as shown by the figures in the margin.[13] The increase in the amount of losses in 1972 and 1973 resulted primarily from the corporation's opening of a second clothing store in Menomonie, Wisconsin, in August of 1971. It appears that the losses attendant upon this wholly unsuccessful second store, which was closed after eleven months of operation, were the basic cause of the failure of the corporation as a whole.

As already indicated, the receiver herein was appointed on petition of one of Mader's creditors on October 8, 1973. As of that time no payments of principal or interest had been made on the Gelatt advances, and Gelatt filed a claim with the receiver for $45,000 plus accrued interest. Hurtgen also filed a claim for approximately $8,500 as the balance due on an advance of $15,000 made by him to the corporation in January of 1973. By decision of February 8, 1975, the trial court sustained the receiver's objection to both claims. The trial court ruled that although there was no question but that the alleged advances were in fact made to and used by the corporation in the conduct of its business, and although there was "absolutely no evidence of any bad faith, or ill intentions" on the part of either Gelatt or Hurtgen, the circumstances existing at the time the

[13]

| Fiscal Period Ending 1–31 | 1967 (10 mos.) | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 |
|---|---|---|---|---|---|---|---|
| Net Profit and Loss: | (2,357) | (9,993) | (16,758) | (2,527) | (2,787) | (33,826) | (36,496) |

advances were made required the conclusion that they were in substance contributions to the capital of the corporation rather than loans. An order was entered subordinating the claims of both men to the claims of other general creditors, from which order Gelatt, but not Hurtgen, has appealed.

It is first claimed by Gelatt that because the statute setting forth the order of payment out of an estate being administered under ch. 128 treats general creditors as a single class, making no provision for priorities within that class, the circuit court was without power to subordinate Gelatt's general claim. This contention is refuted by *In re Merrick Dairy Co.*, 249 Wis. 295, 24 N.W.2d 679 (1946), in which this court held proper the action of the trial court in subordinating salary claims filed in proceedings under ch. 128 by the directors of the insolvent dairy company. We there recognized that there may be claims which are genuine, in the sense that they are neither sham nor unlawful or otherwise subject to complete disallowance, but which arise under circumstances such that it would be inequitable to permit them to participate in distribution of the estate on an equal basis with other general claims. The power of a court to respond to such equities when they are shown to exist in ch 128 proceedings does not stem from any statute specifically conferring it, but is within the inherent authority of a court of equity in administering the insolvent estate "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper v. Litton*, 308 U.S. 295, 305, 60 S. Ct. 238, 84 L. Ed. 281 (1939).

The national Bankruptcy Act contains no provision specifically conferring the power to subordinate the claim of one general creditor to those of other general

creditors, but it is settled that a court of bankruptcy may, by virtue of its nature as a court of equity, subordinate or wholly disallow claims on equitable grounds. *Pepper v. Litton, supra.*[14] A Wisconsin court is directed by sec. 128.15 (1), Stats., to "make such order as shall be just" in adjudicating claims to which objections have been filed. We think it clear that under this broad command a court has ample power to order the subordination of claims when the circumstances so require. The question is whether that power was properly exercised here.[15]

[14] At 3 *Collier on Bankruptcy, sec.* 57.14, pp. 229–233 (14th ed. 1976) it is said:

". . . In passing on an allowance of claims the court sits as a court of equity, which gives it far-reaching powers 'to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.' Mere reasons of equity may sometimes require that a creditor's claim be either totally disallowed or subordinated to the claims of all or of certain other general creditors, such as where the creditor is closely related to the bankrupt, or as a majority stockholder or corporate officer should be treated as a proprietor rather than as a creditor, or where by some previous conduct he is estopped to claim parity with other creditors. Equities to be weighed in connection with the allowance of a claim may vary in importance. They may in extreme cases be strong enough to warrant disallowance absolutely and entirely. In other cases equity may be satisfied with a mere 'subordination' or postponement of a claim, and its relation to a rank inferior to that of all general creditors or of a particular group."

[15] Herzog & Zweibel, *The Equitable Subordination of Claims in Bankruptcy,* 15 Vand. L. Rev. 83 (1961), classify the subordination cases into six categories:

1. Consensual Subordination by the Creditor
2. Debt or Proprietary Interest: The Capital Contribution Cases
3. Fraud
4. Illegality
5. Fiduciary Relationship
6. The Instrumentality and Alter Ego Cases

The only category involved in this case is category 2 which amounts to the inadequate capitalization issue. The order here

Gelatt was an officer and a director of Mader's, as well as the owner of half the outstanding shares of the corporation's stock. However, these facts alone do not permit the subordination of his claim. An officer, director or shareholder—even a sole shareholder—may properly loan money to his corporation, and in the event of insolvency, may participate in the distribution of the estate on an equal basis with other creditors. The law is not hostile to such claims; it is only natural that those most concerned with the success of the corporate venture should be those most ready to extend credit to it when additional funds are required, and there is no legal policy to discourage the making of loans under such circumstances. At the same time, however, the possibilities for abuse are manifold, and where the rights of third parties are implicated, the law approaches transactions between a corporation and those in a position to control its acts with "a large measure of watchful care." A loan to a corporate entity by a substantial or even the sole shareholder is not *per se* invalid or subordinate to other loans. Claims based upon transactions of this character are subject to rigid scrutiny by the courts, and if it appears that honoring the claim will work an injustice, subordination or disallowance of the claim may be required. *Pepper v. Litton, supra; Albert Richards Co. v. The Mayfair,* 287 Mass. 280, 191 N.E. 430, 433, 434 (1934); *Obre v. Alban Tractor Co.,* 228 Md. 291, 179 A.2d 861 (1962); *Arnold v. Phillips,* 117 F.2d 497, 503 (5th Cir. 1941); *Frasher v. Robinson,* 458 F.2d 492 (9th Cir. 1972); *Braddy v. Randolph,* 352 F.2d 80, 84 (4th Cir. 1957); 3A *Collier on Bankruptcy,* sec. 63.06 [5.3] (14th ed. 1975).

on appeal subordinated the separate claim of Hurtgen as well as the claim of Gelatt. Although much of what we say here might apply with respect to both of these claims, because Hurtgen has not appealed, our disposition of the case will not affect the order as to him.

The factors felt by the trial court to justify subordination of the claims in question were primarily (1) that at the time the advances were made the corporation was in a very precarious financial position and urgently in need of funds as a result of sustained heavy operating losses; (2) that the needed funds could not then be obtained from banks or other commercial lending institutions; (3) the notes given by the corporation were demand notes carrying a moderate rate of interest. The court relied upon a decision[16] of the bankruptcy court for the Southern District of Florida in which it was stated that advances to a corporation by its controlling stockholders would be treated as capital:

". . . in those instances in which the advances are made at a time when the debtor's financial condition is in such a serious state that the advances are more related to a desire by the corporate insiders to salvage their investment on a risk basis, as contrasted with a true loan on a temporary basis with reasonable assurance of repayment in the ordinary course of the business.
"Indicators of the requisite serious financial condition are a prolonged series of substantial operating losses, an inability to borrow money from the usual commercial sources, and being on the verge of closing down the business in the absence of the insider advances."

We accept as fully supported in the record the trial court's characterization of the facts before it, and we concede that the above language from the *Brady* decision supports the conclusion the trial court reached. However, we do not accept the *Brady* decision as the only, or necessarily the correct statement of the applicable law. The cases dealing with the "capital contribution" theory of equitable subordination do not form an altogether

---

[16] *In re A. N. Brady Wholesale Hardware, Inc.,* Case No. 70–496–BK–JLK–Y (S. D. Fla. April 12, 1974), opinion of Bankruptcy Judge Yacos.
*See also In re Trimble Co.,* 479 F.2d 103 (3d Cir. 1973), adopting the test of whether a commercial agency would lend funds.

consistent body of law in terms of the stated rationales upon which the courts have based their decisions.[17]

In the cases where subordination of shareholder loans has been ordered on the "capital contribution" theory, certain elements have almost invariably been present. First, claims are based upon what are denominated loans made to the corporation by one or more stockholders in a position of control within the corporation. The individual claimant's control need not be absolute, but the facts must permit of an inference that the claimant or a group of stockholders of which he is a member were in a position to control the affairs of the company, at least to the extent of determining the form of the transaction in question. Second, the circumstances, objectively analyzed, must be such as to indicate that the advance was

[17] Several commentators have pointed out that as a matter of logic, a finding that an advance is in fact a capital contribution should result in disallowance of the claim rather than subordination, since no claim in insolvency may be based on a proprietary interest. Gleick, *The Equitable Power of Bankruptcy Courts to Subordinate or Disallow Claims Entirely on Equitable Grounds*, 25 Referee's J. 99 (1951); Loiseaux, *Loans or Capital Contributions to the Close Corporation*, 38 Referee's J. 4 (1964).

The courts, however, generally only subordinate the claim in such cases. Normally there will be little practical difference—in either case, the claimant will receive nothing. In view of our resolution of this case we need not decide the question. It may be observed, however, that where a surplus does remain, the considerations bearing upon how it should be distributed as between the stockholders may be quite different than those which dictated that the claim be inferior as to outside creditors, and it is not necessarily inconsistent to treat the insider's claim as a loan for one purpose and not the other.

The Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, Part II, 93d Cong., 1st Sess. 115 (1973), proposing sweeping changes in the Bankruptcy Laws, recommends automatically subordinating any claim of controlling shareholders to those of other creditors. Clark, *The Duties of the Corporate Debtor to Its Creditors*, 90 Harv. L. Rev. 505, 536–537 (1977).

not intended to be repaid in the ordinary course of the corporation's business, but rather was expected to remain outstanding as a permanent part of the corporation's financial structure. Third, and closely related to the second element, the paid-in stated capital of the corporation must have been unreasonably small in view of the nature and size of the business in which the corporation was engaged.[18] Though fraud, mismanagement,

[18] *In re Madelaine, Inc.,* 164 F.2d 419 (2d Cir. 1947); *Goldstein v. Wolfson,* 132 F.2d 624 (2d Cir. 1943); *SEC v. Liberty Baking Co.,* 240 F.2d 511 (2d Cir. 1957), *cert denied* 353 U.S. 930; *Rosof v. Roth,* 262 F.2d 829 (2d Cir. 1959); *ITT v. Holton,* 247 F.2d 178 (4th Cir. 1957); *L & M Realty Corp. v. Leo,* 249 F.2d 668 (4th Cir. 1957); *Braddy v. Randolph,* 352 F.2d 80 (4th Cir. 1965); *Arnold v. Phillips,* 117 F.2d 497 (5th Cir. 1941); *Spach v. Bryant,* 309 F.2d 886 (5th Cir. 1962); *Barlow v. Budge,* 127 F.2d 440 (8th Cir. 1942); *Boyum v. Johnson,* 127 F.2d 491 (8th Cir. 1942); *Costello v. Fazio,* 256 F.2d 903 (9th Cir. 1958); *In re Branding Iron Steak House,* 536 F.2d 299 (9th Cir. 1976); *In re Horton,* 22 F. Supp. 905 (D. Tex. 1938); *In re Regency, Inc.,* 96 F. Supp. 535 (D.N.J. 1951), aff'd 192 F.2d 574, *cert. denied* 343 U.S. 905; *In re Lumber, Inc.,* 124 F. Supp. 302 (D. Ore. 1954); *In re Calpa Products Co.,* 249 F. Supp. 71 (E.D. Pa. 1965), aff'd 354 F.2d 1002; *In re Brunner Air Compressor Corp.,* 287 F. Supp. 256 (N.D.N.Y. 1968); *Duberstein v. Werner,* 256 F. Supp. 515 (E.D.N.Y. 1966); *In re Dean & Jean Fashions, Inc.,* 329 F. Supp. 663 (W.D. Okla. 1971); *Obre v. Alban Tractor Co.,* 228 Md. 291, 179 A.2d 861 (1962); *Albert Richards Co. v. The Mayfair, Inc.,* 287 Mass. 280, 191 N.E. 430 (1934). *See also* Loiseaux, *Loans or Capital Contributions to the Close Corporation,* 38 Referee's J. 4 (1964); Herzog & Zweibel, *The Equitable Subordination of Claims in Bankruptcy,* 15 Vanderbilt L. Rev. 83 (1961); Gleick, *The Equitable Power of Bankruptcy Courts to Subordinate or Disallow Claims Entirely on Equitable Grounds,* 25 Referee's J. 97 (1951), 33 Referee's J. 69 (1959); Gleick, *Subordination of Claims in Bankruptcy Under the Equitable Power of the Bankruptcy Court,* 16 Bus. Law 611 (1961); Ashe, *Subordination of Claims: Equitable Principles Applied in Bankruptcy,* 72 Comm. L. J. 91 (1967); Riemer, *Claims Against Bankruptcy Corporations Based on Advances by Controlling Stockholder or Parent Corporations,* 73 Comm. L. J. 273 (1968); Note, *Subordination of Loans*

or conduct amounting to a breach of fiduciary duties to the corporation is often present in the cases treating capital contribution issues, the better reasoned decisions make it clear that such conduct need not be shown.[19] Inequity enough to justify subordination exists when it is shown that a claim which is in reality a proprietary interest is seeking to compete on an equal basis with true creditors' claims.

The first element—an advance by a controlling stockholder—is clearly present here. Gelatt and Hurtgen owned all of Mader's stock between them. It is in regard to the second and third elements that the trial court, and the *Brady Case* upon which it relied, depart from weight of authority.

Though it is not often expressed in decisions, the rule which precludes controlling shareholders from arbitrarily classifying advances as debt appears to be founded on fundamental notions of the risks and rewards appropriate to proprietary and debt interests, respectively. No matter how small the stated capital of a corporation, the owner of half the stock will receive half of whatever profits may be earned. By designating only a small part of their total investment as equity, the stockholders give up nothing by way of profits if the corporation succeeds, but have assured themselves the preferred status of creditors if it fails, thus shifting to the legitimate creditors of the corporation a part of the risk that in fairness should be born by the proprietary interest. As Judge LEARNED HAND said, concurring in *In re V. Loewer's*

*on the Ground of Corporate Undercapitalization,* 23 Md. L. Rev. 260 (1963); Cary, *Corporations, Cases and Materials* 128–147 (4th ed. 1969).

[19] *See* for example, *Costello v. Fazio,* 256 F.2d 903, 910 (9th Cir. 1958); *In re Madelaine,* 164 F.2d 419, 420 (2d Cir. 1947); *In re Dean & Jean Fashions, Inc.,* 329 F. Supp. 663, 668, 669 (W.D. Okla. 1971). *See also* Herzog & Zweibel, note 18, *supra,* at 94, and Clark, note 17, *supra,* at 517–536.

*Gambrinus Brewery Co.*, 167 F.2d 318, 320 (2d Cir. 1948):

"Both the shareholders and the creditors in any enterprise assume some risk of its failure, but their risks are different. The shareholders stand to lose first, but in return they have all the winnings above the creditors' interest, if the venture is successful; on the other hand the creditors have only their interest, but they come first in distribution of the assets. . . . If [persons who at the same time are both creditors and shareholders] are allowed to prove in insolvency on a parity with other creditors, as shareholders of the debtor they can use their control to take all the winnings which may be made on their advances while the company is successful, yet they will expose themselves only to creditors' risks, if it fails."

Thus the courts have readily treated dominant shareholders' advances as capital where the corporation started life with nominal stated capital, the so-called "loans" providing virtually all the funds actually required.[20] Subordination may also be required when it established by expert testimony that the stated capitalization, though greater than nominal, was inadequate to give the corporation a reasonable business chance to operate successfully in view of the nature and size of the business involved.[21] Subordination may be required where the loans are occasioned from insufficiency of capital but not where the loans are attributable to circumstances other than the insufficiency of capital. The longer the period the corporation functions before the controlling shareholders make loans, the greater the likelihood that the loans will not be subordinated.[22]

---

[20] *See, e.g., In re Regency*, 96 F. Supp. 535 (D.N.J. 1951), aff'd 192 F.2d 574, cert. denied 343 U.S. 905; *ITT v. Holton*, 247 F.2d 178 (4th Cir. 1957).

[21] *See e.g., In re Lumber, Inc.*, 124 F. Supp. 302 (D. Ore. 1954); *Costello v. Fazio*, 256 F.2d 903 (9th Cir. 1958); *In re Brunner Air Compressor Corp.*, 287 F. Supp. 256 (N.D.N.Y. 1968).

[22] *See, e.g., Arnold v. Phillips*, 117 F.2d 497 (5th Cir. 1941).

Subordination in the foregoing cases is consistent with the rationale we have stated above: preventing the transfer to outside general creditors of risks properly born by equity capital. However, where stated capital is adequate, the situation is markedly different. By equipping the corporation with a reasonable amount of capital, the shareholders have assumed an appropriate proprietary risk for the nature of the business involved, and the law has not required more. As was said in *In re Lumber, Inc.*, 124 F. Supp. 302, 307, 308 (D. Ore. 1954):

"When a corporation is organized in good faith with adequate capital to carry on a profitable business, there is no requirement in law or equity that its stockholders must provide amply for unforeseen losses not ordinarily contemplated in such a business. . . . '[T]o preserve the independence of an enterprise which is needed to support the continuation of separate legal personality the stockholders must provide the entity, with separate assets sufficient to give it *at least a reasonable business chance to carry out its asserted functions.*'" (Opinion of Referee Estes Snedecor, adopted by the District Court in its entirety.)

Again in *Obre v. Alban Tractor Co.*, 228 Md. 291, 179 A.2d 861, 863 (1962), the Maryland court stated:

"In our view, appellees have failed to show that $40,000 was an unreasonable amount of capital upon which to predicate success in the corporate venture. No evidence was offered to reflect the financial status of the corporation other than its authorized capital stock and the fact that it encountered financial difficulties early in its operations and eventually foundered. This, in our view, failed to establish that the financial set-up of the corporation was a sham, or worked an injustice. As Lattin points out in his treatise on corporations:

" 'There are many things that contribute to the financial downfall of a business enterprise, and lack of adequate capital is but one of these. No hard and fast rules have yet been laid down to test the adequacy or inade-

quacy of the capital of a corporation. Probably no more should be expected of men who start a new enterprise than what reasonably prudent men with a general knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise.' Lattin, Corporations, ch. 2, sec. 5(a)."

Where a corporation is once provided with a reasonably adequate fund of stated capital but subsequently requires additional funds, the stockholders may advance those funds as a loan in an attempt to enable the corporation to continue in business, and, provided no inequitable conduct is shown, the stockholders may participate with other creditors in the distribution of the insolvent estate. *Arnold v. Phillips*, 117 F.2d 497, 501–503 (5th Cir. 1941) ; *In re Madelaine, Inc.*, 164 F.2d 419, 420 (2d Cir. 1947) ; *Spach v. Bryant*, 309 F.2d 886, 889 (5th Cir. 1962) ; *Costello v. Fazio*, 256 F.2d 903, 907 (9th Cir. 1958).

The approach taken by the trial court in the instant case is therefore rejected. The trial court made no finding with respect to the adequacy of Mader's stated capital of $65,000, relying instead on the fact that the corporation was then in urgent need of funds and was unable to borrow from normal commercial sources. We question the validity of such a test. Where a small corporation is involved, lending institutions will commonly require a personal guaranty as a condition to granting a loan to even a healthy enterprise, and their willingness to lend may depend as much upon their perception of the solvency and reliability of the guarantor as upon the corporation's financial condition. Moreover, as already indicated the nature of an advance as capital or debt should not necessarily turn on the likelihood that the company will survive and be able to make repayment, but on whether such repayment was anticipated if the company

survived the hardship that prompted the advance in the first place.

The Bankruptcy Court in *Brady* recognized the potential in its ruling for discouraging the extension of credit to ailing corporations by stockholders, but felt that "no important policy is being served when a corporate cripple is aided in hobbling along, acquiring new debts and unpaid suppliers, by 'loans' from corporate insiders . . . ." However, there are undoubtedly cases in which the "cripple" recovers, repays the shareholders' loans, and lives a useful life. From the standpoint of social policy we think it an open question which consideration should predominate,[23] and in view of the weight of authority, we decline to accept the rationale of the *Brady case.*

We are of the opinion that Gelatt's claim should not have been subordinated. It may have been that the corporation's initial stated capital of $15,000 would have been unreasonably small for a corporation operating two clothing stores. However, the capital of the firm had been increased to $65,000 prior to the opening of the Menomonie store, and was $65,000 when Gelatt's advances were made. There is no basis in the record upon which it could be found that $65,000 was an unreasonably small capital for an operation of the size and character here involved. The amount is certainly not nominal or so small as to be obviously insufficient, and no expert testimony was presented from which a more refined determination could be made. Nor is this a case where the actual capital needs have been demonstrated by a period of stable operation, or where the mere fact that the corporation failed is evidence of insufficient capitalization. The record does not indicate that inadequate capitalization was the cause of Mader's demise.

Moreover, there is little in this record to support an inference that the advances were intended to be a perma-

---

[23] Clark, note 17, *supra*, at 536–540.

nent part of Mader's financial structure. Gelatt testified, in substance, that the loans would have been repaid if the corporation had been able to survive its difficulties and become a successful operation. There is little in the record to contradict this testimony, and it is consistent with the fact that Hurtgen's first loan to the corporation was in fact repaid in full. It appears that the corporation used its bank credit as a more or less permanent form of debt financing, but we do not think it can be said that this was true as to Gelatt's loans as well.

We have in this case a corporation which was organized and operated in good faith and which was endowed with paid-in capital not shown to be unreasonably small for the objects sought to be accomplished. However, disastrous losses of a character not necessarily foreseen resulted in connection with the Menomonie store. Funds in the form of a loan were advanced by Gelatt to enable the corporation to survive the resulting crisis and continue in business. Under the circumstances present here, Gelatt's advances were loans in substance as well as form, and he should be permitted to participate in the distribution of the assets held by the receiver on an equal footing with other general creditors of the corporation.

*By the Court.*—That part of the order subordinating the claim of Gelatt is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.