EQUILEASE CORPORATION

v.

M/V SAMSON, etc., et al.

FRED S. JAMES & CO. OF TEXAS, INC.

v.

EQUILEASE CORPORATION, et al.

Civ. A. Nos. 81–112, 81–234.

United States District Court,
E.D. Louisiana,
Section "I".

March 18, 1983.

James G. Burke, Jr., Burke & Mayer, New Orleans, La., for plaintiff.

Philip A. Franco, Adams & Reese, New Orleans, La., for defendants.

MENTZ, District Judge.

In C.A. 81–234, Fred S. James & Co. of Texas, Inc. ("James") filed a complaint against Equilease Corporation ("Equilease"), Dunnamis Offshore Towing, Inc., ("Dunnamis"), Unilease 13, Inc., Unilease 14, Inc., and Unilease 20, Inc., *in personam,* and against the M/V SAMSON, the M/V THOR, and the M/V HERCULES, *in rem,* both for the insurance premiums due and payable on the vessels in the amount of $231,621.00 and for interest, costs and attorneys fees. James' suit was originally transferred to this section for consolidation with Civil Actions Nos. 80–4785 and 81–112.

The latter two cases, except for James' intervention in 81–112, were subsequently dismissed. The Court conducted a non-jury trial in C.A. 81–234 on January 3, 1983. After the trial, the Court took the matter under submission.[1] Having reviewed the evidence, the memoranda of counsel, and the applicable law, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Equilease, a wholly-owned subsidiary of Eltra Corporation ("Eltra"), engages in financing through both mortgages and leases. James, a national insurance broker, is a principal supplier of marine insurance. James' own offices are located in Texas. It has affiliated offices, however, with Fred S. James & Co. of New York in New York.

In 1974, Equilease agreed to provide interim construction financing to the owner and builder of the tugs M/V SAMSON, M/V THOR, and M/V HERCULES. Equilease foreclosed upon and became the owner of these three vessels in 1977, after a default by the shipyard and the owner. At that time, however, the boats had not been completed but were still sitting in the shipyard at Lockport, Louisiana. Equilease did not decide to complete the three tugs until 1978. The remaining work was then done at the Avondale Shipyard in New Orleans.

After the tugs were completed, Equilease transferred the title of each vessel to a separate "shelf" corporation. One tug was transferred to Unilease 13, Inc.; another to Unilease 14, Inc.; and another to Unilease 20, Inc. In return, each Unilease corporation granted a preferred first mortgage to Equilease. These mortgages covered the cost of each vessel, the fraud losses sustained at the original shipyard, the cost of completion, plus other expenses. The following facts about the Unilease corporations are relevant to the resolution of this

---

1. On January 26, 1983, this Court signed an ex parte order dismissing Dunnamis from the case without prejudice. Since signing the order, the Court has learned that Equilease strenuously objects to the dismissal. Because of this objection and because the order was considered and signed ex parte, the Court hereby vacates that order.

dispute. Each was capitalized at the nominal figure of $200 and filed a consolidated federal income tax return with Equilease. The officers and directors of each corporation were employees of Equilease. Finally, at all relevant times, Equilease remained the sole stockholder of each corporation and furnished each with the same attorney.

At trial, Mr. Hal B. Parkerson, Vice President and General Counsel of Equilease and the three Unilease companies, described Equilease's general activities. He stated that in structuring transactions during the period relevant to this suit Equilease generally had to comply with the requirements of companies that lent Equilease money under bond and financing arrangements. When asked about the business purpose of Equilease placing the tugs in separate Unilease corporations, rather than retaining ownership, Parkerson offered the following explanation:

(1) Each Unilease corporation was the type of asset Equilease would get credit on under a lending agreement. He referred specifically to the preferred first mortgage granted by each Unilease corporation to Equilease in return for the transfer of the vessel.

(2) The preferred first mortgage was convenient from the standpoint of a possible sale to a third party. To illustrate, Parkerson mentioned discussions between Equilease and Manufacturers Hanover Bank of New York regarding the possibility of purchasing the three Unilease mortgages on a recourse basis.

(3) The creation of the Unilease "shelf" corporations enabled Equilease to avoid possible exposure for tort losses.

(4) By having the Unilease corporations as wholly-owned subsidiaries and by filing a consolidated tax return, Equilease retained the investment tax credit, as well as the depreciation on the three vessels.

In 1978, while negotiating for the completion of the three tugs, Equilease entered into a bareboat charter agreement for all three tugs with Solar Fleet, Inc., a company whose sole shareholder and president was Mr. Speck Denning. A year later, Solar's interest in the agreement was transferred to or inherited by Dunnamis, another of Denning's wholly-owned corporations. Equilease decided to enter into this agreement and to maintain it even though the company had previously had financial problems with Denning, including having to bring a suit against him, which the company won.

Parkerson testified at trial that the charter agreement contained a provision requiring Dunnamis to purchase insurance. That provision brought James into the picture. Knowing that its New York affiliate handled the Eltra account, James was very interested in retaining the business generated by the Eltra-Equilease companies. To put Denning and Dunnamis in an operating position, Equilease advanced $200,000 in working capital but did not require monthly payments for the first several months. Denning took out the necessary insurance with James, at a cost of over $200,000. Although $184,000 of the first year's premiums were still unpaid at the end of the first policy year, James did not bring suit against Dunnamis. Instead, in late September or early October of 1980, James financed the premiums with Borg-Warner Finance Company ("Borg-Warner"). When the financing took place, for $215,000, that sum consisted mostly of earned premiums for the 1979–1980 premium year, so that James had to endorse the note. The financing agreement itself involved only Dunnamis and James.

Denning worked the three vessels in the Gulf for several months but did not generate sufficient funds to pay Equilease under the bareboat charter. To ensure full use of the vessels, Dunnamis executed a contract with Newpark Marine Services ("Newpark") under which Newpark would receive a 10% commission for its services in obtaining full use of the three boats. Shortly thereafter a dispute arose between Dunnamis and Newpark over whether Newpark or Dunnamis should pay the fuel bill. Following this dispute, relations between Dunnamis and Newpark continued to deterio-

rate until they were terminated. After the Newpark arrangement was terminated, Denning thought he could obtain a better contract from Pemex, the Mexican national oil company. Toward this end, Denning apparently set out with the three vessels for Tampico. Owing to various misunderstandings, however, Denning brought the vessels to Panama, where they were finally brought back into the custody of Equilease-Unilease. Parkerson stated that he had made a trip to Tampico, where he ascertained that Denning had misrepresented the nature of the Mexican contract to Equilease. Only at that point did Parkerson conclude that Equilease-Unilease could no longer rely on Denning.

While neither Equilease nor Unilease had control over the purchase of insurance from James, and while James was responsible for Denning's return from Mexico to sign the Borg-Warner finance agreement, the Court finds that the only reason James cooperated with Denning and Dunnamis was because James reasonably believed that Equilease was Denning's firm financial backer. This finding is strongly supported by the trial testimony of Mr. William K. Hargrove, an expert in marine insurance who was employed by James during the period relevant to this dispute. Hargrove testified that, from the beginning, when James originally decided to issue Dunnamis a policy, James' understanding was that Dunnamis would pay the premiums but that the money would be coming from Equilease.

On Dunnamis' 1979–80 policy, the named assureds were "Dunnamis and Equilease and Unilease." Both Equilease and Unilease were listed as owners. On the 1980–81 policy, however, when Dunnamis' receivables were being assigned to Equilease, only Equilease was named as owner. According to Hargrove, instructions for this latter policy were given by Mr. Barranko, Risk Manager of Eltra. All correspondence went directly to Denning, with copies going to Parkerson and to Mr. Harrigan, Vice President of Equilease. The premiums on this policy were paid in part by Dunnamis. Hargrove testified that he thought Equilease was advancing money to Dunnamis to pay the bills, but none of the insurance premiums were ever paid by Equilease itself. After financial problems developed Denning advised Hargrove that Equilease was "taking over" and would pay the Dunnamis premiums. Although Denning received "favorite son" treatment from Equilease throughout this period, this treatment did not make him the agent of Equilease.

Hargrove emphasized that, when the boats left for Mexico, James decided to stay on the risk only after talking to Parkerson. When asked, however, whether Parkerson had agreed to pay the insurance, Hargrove said "no."[2] Parkerson's only relevant comment appears to have been that "Equilease would be taking over" from Dunnamis and Denning. There is a contention that Exhibit 22, signed by "Speck", stating that "Equilease is taking over," is also important. Since this communication came from Denning, however, rather than from any agent of Equilease, the Court disagrees. Hargrove stated that, after the boats went to Mexico, Barranko asked whether there was coverage on the "breach of warranty" portion of the policy. Hargrove said Barranko was told the coverage was in effect and applicable to boats being taken out of the country. Hargrove stated he did not ask Equilease or Eltra to guarantee the Borg-Warner note or the account.

The testimony of Mr. Lionel "Pappy" Ruckstul, former president of Newpark, demonstrates the necessity for vessels having the proper insurance. Ruckstul stated that Newpark would not accept the three vessels into its fleet without certain insurance coverages. These coverages were re-

---

**2.** *See* Pre-Trial Order Statement of Uncontested Facts (7)(c)(15):

At no time did any officer, director, employee or agent of Equilease Corporation, its parent Eltra Corporation, or Unilease 13, Inc., Unilease No. 14, Inc. or Unilease 20, Inc. purchase the aforementioned insurance policies, procure the aforementioned policies, order the aforementioned insurance policies, request the issuance of the binders of the aforementioned insurance policies, or otherwise contract for the insurance mentioned above.

quired, in turn, by agreements Newpark had with its own customers. Ruckstul explained that a company such as Newpark will not be invited to bid on a job unless the company is on an approved list indicating the company has all of the required insurance. Ruckstul's testimony regarding the need vessels have for insurance was corroborated by Mr. Robert W. Wells Breeden, Senior Vice President for Caroon & Black Insurance Agency, who stated that 99% of the boats operating offshore carry full insurance as a necessary expense of operating. Also of note in this connection is the testimony of Parkerson, which reveals Equilease required all of its affiliated companies to carry adequate insurance and would not do business with any company that failed to carry adequate insurance.

## MARITIME LIEN

■ The Louisiana Civil Code, art. 3237, provides as follows:

> The following debts are privileged on the price of ships and other vessels, in the order in which they are placed:
>
> (10) The premiums due for insurance made on the vessel, tackle, and apparel, and on the armament and equipment of the ship.
>
> The term of prescription of privileges against ships, steamboats, and other vessels shall be 6 months.

Since the present suit was filed on January 19, 1981, and the last acknowledgment of this account occurred in late September or early October of 1980, when the Borg-Warner instalment contract was negotiated by Dunnamis and James, the account had not prescribed at the time this suit was filed. The Court therefore finds that the suit itself was filed within the six-month prescription period. *See* La.C.C. arts. 520 and 3535 (Prescription "only ceases from the time when there has been an amount acknowledged, *a note or bond given,* or a suit instituted." (emphasis added) Article 3237 of the Louisiana Civil Code refers to the six-month period as being one of *prescription* rather than peremption as contended by Equilease. The case of *In Re Safticraft*

*Corporation,* 255 F.Supp. 797 (W.D.La.), *affirmed* 376 F.2d 855 (5th Cir.1967), applied Article 3518, contained in the chapter on Prescription, in holding that an interruption took place. This shows the Court considered the six-month period contained in Article 3237 to be one of prescription.

■ James urges this Court to find that for the unpaid insurance premiums James is entitled to a privilege on the vessels M/V SAMSON, M/V THOR, and M/V HERCULES under Louisiana law and to a maritime lien on those vessels under federal law. The Court agrees that James has a privilege on the three vessels, *see* L.C.C. art. 3237, and that that privilege is enforceable by this Court. *Grow v. The Loraine K,* 310 F.2d 547 (6th Cir.1962); *see generally* Comment, Developments in the Law of Maritime Liens, 45 Tul.L.Rev. 574, 598–604 (1971). The Court cannot agree, however, that James has a federal maritime lien on the vessels.

■ The Federal Maritime Lien Act provides, in pertinent part:

> Any person furnishing repairs, supplies, towage, use of drydock or marine railway, or *other necessaries,* to any vessel, whether it be foreign or domestic, upon the order of the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C. § 971 (emphasis added). As James rightly points out, the jurisprudence interpreting this section of the Act requires that the phrase "other necessaries" be given a broad meaning. *J. Ray McDermott & Co. v. The Offshore-Menhaden Co.,* 262 F.2d 523 (5th Cir.1959). The phrase does not refer to something that is absolutely indispensable. *Ajubita v. S/S Peik,* 428 F.2d 1345 (5th Cir.1970). It refers, instead, to supplies and services that are "reasonably needed in [a] ship's business." *Walker-Skageth Food Stores, Inc. v. The Bavois,* 43 F.Supp. 109, 110 (S.D.N.Y.1942). As the testimony of several witnesses reveals, insurance is something every vessel today needs just to carry on its normal business. Messrs. Breeden,

Hargrove, Parkerson and Ruckstul all agreed on this point. The Court here thus has no doubt that, as a practical matter, insurance falls into the class of "other necessaries." As a legal matter, however, insurance does not fall into that class.

More than eighty years ago, in a case that is still good law, *Learned v. Brown*, 94 F. 876 (5th Cir.1899), the Fifth Circuit held that a federal maritime lien cannot be predicated on unpaid insurance premiums. Since then, other courts have reached the same conclusion. The Sixth Circuit, for example, recently stated that "Neither admiralty law nor the Federal Maritime Lien Act ... provide[s] for a lien for unpaid insurance premiums." *Grow, supra* at 549. Similarly, in *West of England Shipowners v. Patrick S.S. Co.*, 491 F.Supp. 539, 544 (D.Mass.1980), the court stated that "the case law is clear that claims of an insurer for unpaid insurance premiums do not give rise to a maritime lien." This Court is not in a position to ignore or reject these precedents. More specifically, it has no authority to overturn *Brown*. If that decision is to be overturned, it will have to be overturned by the Fifth Circuit. The Court finds, therefore, that James is entitled to a lien for all unpaid premiums owed to the company, but that the lien to which James is entitled arises only under state law.

## THE UNILEASE COMPANIES

■ According to well-established jurisprudence, a finding of control or domination of a corporation by an individual or a corporate entity in the use of the corporate fiction is a prerequisite to the application of the alter ego theory of liability. *Noe v. Roussel*, 310 So.2d 806 (La.1975); *Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc.*, 424 F.Supp. 815 (N.D.Ill.1976). The fiction of corporate entity will be disregarded, however, whenever justice so requires. *In re Bowen Transport, Inc.*, 551 F.2d 171 (7th Cir.1977). The corporate veil should always be pierced, moreover, whenever the separate entity theory leads to an absurdity or whenever persons involved in a corporation seek to use the legal fiction to immunize themselves from the consequences of their fraud or illegality. *Haynes v. Champagne Title Corp.*, 228 F.Supp. 157 (E.D.La.1964); *Houston Oil Field Material Company v. Stuard*, 406 F.2d 1052 (5th Cir. 1969).

■ In the present case, all of the evidence reveals that the three Unilease corporations were the "alter ego" of Equilease. This is shown by the following. Under the Ship Mortgage Act, preferred status is given if, among other things, an affidavit is filed stating that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel. 46 U.S.C. § 922(a)(3). That requirement was not satisfied in this case. Here sole control of the Unilease corporations was held and exercised by Equilease. Equilease owned all of the Unilease stock, furnished all of the Unilease directors and officers, all of the companies' financing, and all of its salaries and legal counsel. The only business the Unilease corporations ever had was that given to it by Equilease. Finally, the Unilease corporations filed a consolidated federal tax return with Equilease. All things considered, then, Equilease appears to have enjoyed total control and supervision. Under these circumstances, the "good faith affidavit" of the Unilease mortgagors was a sham. Consequently, the subject mortgage must be held void as to James.

Although the Equilease-Unilease arrangement was not of itself illegal, third parties must be protected from suffering financial loss caused by that arrangement. Had Equilease continued to hold title to the three tugboats, James undoubtedly would have had the first lien on all three vessels. Hence Equilease cannot put itself ahead of other legitimate creditors by transferring the boats to three controlled corporations, and then taking a preferred first mortgage on the vessels, the amount thereof representing capitalization of its investment in those vessels.

## LIABILITY OF DUNNAMIS AND/OR EQUILEASE

There is no question but that Dunnamis is liable for the debt here sued on. Although some evidence exists that Equilease made a verbal commitment to pay this debt, such commitments are not binding under Louisiana law. The Louisiana Civil Code is quite explicit on this point. It states: "[P]arole evidence shall not be received ... (3) to prove any promise to pay the debt of a third person." La.C.C. art. 2278.

In light of the foregoing, the Court hereby VACATES the Order Dismissing Dunnamis without prejudice, signed on January 26, 1983, and enters judgment as follows:

(1) Granting Fred S. James & Co. of Texas, Inc., judgment *in personam* against Dunnamis Offshore Towing, Inc. and *in rem* against the M/V THOR, SAMSON and HERCULES, for the amount sued upon, plus legal interest from judicial demand, together with 10% of principal and interest as attorneys' fees and for all costs of these proceedings, subject to the submission by James within 30 days of a statement showing the proportion of premiums paid on each vessel.

(2) Voiding the preferred first mortgages of the Equilease Corporation, Unilease 13, Inc., Unilease 14, Inc., and Unilease 20, Inc., insofar as the claims of Fred S. James & Co. of Texas, Inc. are concerned.

(3) Dismissing the intervention of Fred S. James & Co. of Texas, Inc., in Civil Action No. 81–112 as being duplicative of the complaint in Civil Action No. 81–234.