EQUILEASE CORPORATION,
Plaintiff-Appellant
Cross-Appellee,

v.

M/V SAMPSON, Etc., et al., Defendants-Appellants Cross-Appellees,

v.

FRED S. JAMES & CO., etc., Intervenor-Appellee Cross-Appellant.

FRED S. JAMES & CO., etc., Plaintiff-Appellee Cross-Appellant,

v.

EQUILEASE CORP., et al., Defendants-Appellants Cross-Appellees.

No. 83–3298.

United States Court of Appeals,
Fifth Circuit.

Sept. 27, 1984.

Adams & Reese, Frank M. Adkins, Philip A. Franco, New Orleans, La., for Equilease Corp.

Burke & Mayer, James G. Burke, Jr., Therese B. Forrester, New Orleans, La., for Fred S. James & Co.

Before REAVLEY, JOHNSON and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Equilease Corporation and the three Unilease Corporations (collectively "Equilease" unless otherwise noted) appeal the district court's holding, 568 F.Supp. 1259 (D.La. 1983) that Fred S. James Company ("James"), an insurance agency, has an enforceable state privilege for unpaid insurance premiums against three vessels owned by Equilease and that the privilege had not prescribed. James cross-appeals, but because we affirm the district court, we need not reach the issues James raises on cross appeal.

## I.

Equilease is a financial corporation that in 1974 provided interim construction financing for three vessels, later named the M/V SAMPSON, the M/V THOR, and the M/V HERCULES. In 1977 the owner of the vessels defaulted on its loan, leaving Equilease as involuntary owner of the uncompleted vessels. After determining that selling the hulls would not be economical, in 1978 Equilease moved the vessels to another shipyard for completion at its own expense. Upon completion, Equilease transferred title to each of the vessels to a separate, wholly owned, nominally capitalized Unilease "shelf" corporation, taking a preferred first mortgage from each corporation in the amount of construction cost and other expenses.

Having no experience in the operation of vessels, Equilease issued a bareboat charter on each of the vessels to Solar Fleet, Inc., a company wholly owned by James S. Denning. Denning later transferred the charters to Dunnamis Offshore Towing, Inc. ("Dunnamis"), another corporation he owned. The Equilease charter required the charter party to purchase insurance for each of the vessels. Dunnamis procured this required insurance from Fred S. James & Company.

At the end of the first year of operation, $184,000 of the insurance premiums remained unpaid. Dunnamis informed James that the three vessels soon would begin operating in Mexico under a lucrative five-year charter agreement. Relying on this information, James decided to provide insurance for the three vessels for another year rather than cancelling the policy and bringing suit for the unpaid premiums. James paid the overdue premiums to the insurers. Then, as James explains, "to clear up the books from an accounting standpoint," James arranged for a financing company, Borg-Warner Insurance Finance Corporation ("Borg-Warner"), to pay the outstanding overdue premiums. James arranged for Borg-Warner to accept a note executed by Dunnamis and then prepared the documents necessary to effect the transaction. Borg-Warner had James guarantee the Dunnamis note so that James, rather than Borg-Warner, bore the risk of non-payment by Dunnamis. When James received funds from Borg-Warner, it made appropriate bookkeeping entries, crediting Dunnamis' overdue account in full.

During the second year of their relationship, Equilease became concerned about the manner in which Dunnamis was operating its vessels. Dunnamis already had defaulted on the charter agreement, and the charter in Mexico had not worked out as expected. Equilease, with some difficulty, finally located its vessels in Panama. It brought the vessels back to the United States at its own expense, then seized them and instituted proceedings in federal district court to foreclose on its preferred mortgages.

By that time Dunnamis evidently also had defaulted on its insurance note payments to Borg-Warner. James, as guarantor, feared that it might have to pay Borg-Warner, and therefore intervened in the foreclosure proceedings, claiming a state privilege [1] and maritime lien against the vessels for unpaid insurance premiums. James also filed a separate but substantially similar lawsuit against Equilease and Dunnamis *in personam*, and against the three vessels *in rem*. The district court consolidated the actions.

After hearing the evidence, the court held that James has a state privilege against the vessels for the amount of the unpaid insurance premiums, and that because Dunnamis acknowledged the debt within six months of the filing of the lawsuit, the applicable six-month prescriptive, or limitations period had not lapsed. It refused, however, to create a federal statutory maritime lien in favor of James, relying on this court's decision in *Learned v. Brown*, 94 F. 876 (5th Cir.1899). It then invalidated the preferred mortgage on the basis that the three Unilease corporations were "shams" and "alter egos" of Equilease against the vessels, thus reducing Equilease to the status of a general creditor against the vessels.[2] It further held

1. The Louisiana Civil Code provides that a debtor's property is the common pledge of his creditors, and in the absence of cause for preference, the creditors rank equally. La.Civil Code art. 3183 (West 1952). One cause of preference is the privilege, which arises by operation of law, and allows a creditor preferred status over other creditors because of the nature of the debt owed him. La.Civil Code arts. 3184 and 3186.

2. The district court's rationale on this issue leads to confusing and contradictory conclusions, or so it seems to us. If the district court meant that the Unilease corporations are "shams" and "alter egos" of Equilease, then Equilease is the owner of the vessels and not the mortgagee. It therefore has no creditor's claim against ships it in fact owns. The district court, however, indicated that it was invalidating the mortgages "as to James," and referred to Equilease as a "legitimate creditor," but one who could not advance its claims over other general creditors. We are thankful that we are not asked to resolve this conundrum on appeal, and that its resolution is not relevant to the issues we must decide. Whether the district court pierced the corporate veil between Equilease and the three Unilease corporations generally, or whether it simply invalidated the "preferred" status of the ship mortgage, Equilease's strategy on appeal evidently is to reduce James to the status of a general creditor, so that its earlier mortgage will have priority over James' lien. Equilease does not appeal the district court's holding that the Unilease corporations are "shams" or "alter egos."

that Dunnamis was not an agent of Equilease with the power to obligate Equilease to pay the premiums. It entered judgment in favor of James *in rem* against the vessels, and *in personam* against Dunnamis, who does not appeal.

## II.

The parties raise several issues on appeal and cross-appeal, including whether James holds a privilege for unpaid insurance premiums, whether the privilege survived execution of the note to Borg-Warner, and whether the privilege prescribed. Because we resolve these issues in favor of James, we need not address the other issues raised.

## A.

 First, we reject Equilease's argument that James, as an insurance agency and not an insurer, cannot enforce the debt for unpaid insurance premiums secured by the privilege. Louisiana courts apply a rule "that the insurer, not the agent, is the proper party to sue for premiums due on an insurance policy *unless* the agent has paid the [insurance] company for the premiums or has become personally liable therefor, in which case the agent can sue for the premiums in his own name." *Cypress Insurance Agency, Inc. v. Aqua Blast Service Co.,* 347 So.2d 1198, 1199 (La.App. 1977) (emphasis added). *See also Perrin v. Saunders,* 198 So.2d 555, 557 (La.App. 1967); *Page v. Marcel,* 44 So.2d 363, 368 (La.App.1950). James actually paid the insurance premiums to the insurers, and therefore has a right of action for the unpaid premiums against the insureds, and, pursuant to Article 3237 of the Louisiana Civil Code, also against the vessels.[3]

## B.

Article 3237 provides that:

The following debts are privileged on the price of ships and other vessels, in the order in which they are placed:

. . . .

(10) The premiums due for insurance made on the vessel, tackle, and apparel, and on the armament and equipment of the ship.

. . . .

The term of prescription of privileges against ships, steamboats and other vessels shall be six months.

 The lien created by Article 3237 is *stricti juris;* it cannot be extended by implication or analogy. La.Civ.Code Ann. art. 3185 (West 1952); *P.B.C. Systems, Inc. v. L.A.D. Construction Co.,* 428 So.2d 984 (La.App.1983); *Pelican State Associates, Inc. v. Winder,* 208 So.2d 355 (La.App. 1968), *aff'd* 253 La. 697, 219 So.2d 500 (1969). The debt Dunnamis owed to James for unpaid insurance premiums, however, clearly falls within Article 3237. That James guaranteed Dunnamis' note payable to Borg-Warner in the amount of unpaid insurance premiums, in exchange for Borg-Warner's payment of that amount to James, does not change the nature of the underlying obligation flowing from Dunnamis to James.

 Whether the transaction among James, Borg-Warner, and Dunnamis extinguished James' privilege for unpaid insurance premiums and created another type of debt—specifically, a debt to Borg-Warner on a note—depends on whether the parties intended a novation of the debt secured by the privilege. *Farmers' National Bank of*

---

**3.** Equilease vigorously argues that before James can claim a privilege for unpaid insurance premiums it must prove that it, as an insurance agent, was subrogated to the legal rights of the insurers who actually provided the insurance and to whom the premiums were due. Louisiana, law, however, does not require proof of legal subrogation, but requires only that an agent prove something more than that it sold and delivered the policies to the insured. *Perrin v. Saunders,* 198 So.2d at 557. Any "connection or relationship" between the defendant insured and the plaintiff will suffice. *Id.* The agent's actual payment of or liability for premiums is such a connection. *Cypress Insurance Agency,* 347 So.2d at 1199. Thus, we need not discuss Equilease's subrogation argument.

*Lebanon v. Belle Alliance Co.,* 142 La. 538, 77 So. 144 (1917). A "novation is a contract consisting of two stipulations; one to extinguish an existing obligation, the other to substitute a new one in its place." La.Civ.Code art. 2185. Novation may result from substitution of debtors or, as in this case, substitution of creditors. *E.g., Sterlington Bank v. Terzia Lumber & Hardware, Inc.,* 146 So.2d 233, 235 (La. App.1962). Louisiana law, however, never presumes that parties intended to create a novation of an existing debt, but requires clear proof of intent to discharge the original debt and substitute a new one in its place. *Id.* at 235. *Cf.* La.Civ.Code art. 2192 (novation requires expression of intent by creditor to discharge original debt). The intent to create a novation may be expressly declared, or may be tacit and implied from the nature of the contract or from external circumstances. *Placid Oil Co. v. Taylor,* 325 So.2d 313 (La.App.1976).

█ A change in the form of a debt does not by itself create a novation. Executing a note to renew an old debt, for example, "does not novate the original debt or destroy the privilege securing the same." *Farmers' National Bank of Lebanon,* 142 La. at 538, 77 So. at 144. *See also Wilson v. Clerk of Court,* 148 So.2d 775, 777 (La. App.1963). *Cf. In re Red River Line,* 115 La. 867, 40 So. 250, 252 (1905) (parties conceded note received *"as cash"*). Similarly, acceptance of subsequently dishonored checks does not destroy the privilege underlying the debt the debtor gave the checks to satisfy. *Sterlington Bank,* 146 So.2d at 236.

The transactions analyzed in *Insured Lloyds Insurance Co. v. Woodle,* 248 So.2d 862, 864 (La.App.1971), although involving automobile insurance, parallel the facts of this case. The insured in *Woodle* procured automobile insurance from the plaintiff. He obtained a loan from an independent finance company to pay the premium, giving the finance company a downpayment and a note for the balance. The finance company then transferred the downpayment and sold the insured's note to the insurer. Later the insurer brought suit against the insured for unpaid premiums, and the insured moved to dismiss for no cause of action on the basis that the premiums had been paid. The insured argued that the only cause of action the insurer might have flowed from its status as a holder of the note. The Louisiana Court of Appeals held that the downpayment and note transferred by the finance company to the insurer did not extinguish the debt owed directly by the insured to the insurer unless the parties intended a novation. *Id.* at 864–65.

*Wilson v. Clerk of Court,* 148 So.2d 775 (La.App.1963) also provides insight into this case. In *Wilson* a supplier of building materials took a note from its debtor, a contractor, in the amount of a debt secured by liens on the construction. The supplier then made appropriate bookkeeping entries, crediting the contractor's open account and debiting a note account. The contractor later brought a mandamus action seeking cancellations of the supplier's materialmen's lien. In recognizing the validity of the lien, the Louisiana Court of Appeals failed to find any consideration for the note flowing to the supplier. It held that the supplier's booking debits and credits, reflecting receipt of the note, did not prove that the parties intended to create a novation, especially in the light of the surrounding circumstances suggesting that the creditor, by accepting the note, did not intend to relinquish any previously existing rights. *Id.* at 777.

█ The record in this case does not contain evidence sufficient to prove that the parties intended to create a novation or that James intended to extinguish the original debt Dunnamis owed for insurance on the three Equilease vessels. According to *Insured Lloyds,* James' guaranty or purchase of a note does not, by itself, prove that James intended to create a novation, and according to *Wilson,* James' bookkeeping entries also are insufficient. The record contains no other evidence that James intended to relinquish any rights, and the manner in which the parties struc-

tured the Borg-Warner transaction indicates that the parties intended the existing obligation to continue.

James sought funds to pay the insurers for Dunnamis' overdue premiums. Dunnamis could not provide those funds. James therefore arranged to procure them from Borg-Warner. Although Borg-Warner took a promissory note from Dunnamis, and not from James, it relied on the credit of James and not that of Dunnamis. It did not even require collateral from Dunnamis, but instead required James to guarantee the note. James, then, bore the risk of default by Dunnamis. When Dunnamis defaulted, it still owed James a debt for insurance premiums that were outstanding before the Borg-Warner transaction. Considering all the facts of this case, James' change in status from an account creditor to a creditor on a note is immaterial to its status as holder of a privilege. Here, the privilege against the vessels secured the debt in either form. The remaining question, then, is whether the privilege became extinct because it prescribed. La.Civ.Code art. 3277. We hold that it did not.

### III.

#### A.

Again we must first reject Equilease's argument, which is that because Article 3237 itself contains a limitations period, that period is one of peremption and not of prescription. Peremption is a species of prescription "with the characteristic that it does not admit of interruption of suspension." *Flowers, Inc. v. Rausch,* 364 So.2d 928, 931 (La.1978). Stated differently, "The difference between prescription and peremption is that the former simply bars the remedy whereas, in the latter, time is made of essence of the right granted and a lapse of the statutory period operates as a complete extinguishment of the right." *Succession of Pizzillo,* 223 La. 328, 65 So.2d 783, 786 (1953). If Equilease is correct, then James cannot assert its privilege to collect any premiums that were more than six months overdue when it filed this lawsuit. *Cf.* La.Civ.Code art. 2496 (West Supp.1984) (prescription begins to run from the day payment is exigible).

Authority exists in Louisiana cases to support the proposition that a prescriptive period defined in a statute conferring a right is actually a peremptive period. *See, e.g., Pounds v. Schori,* 377 So.2d 1195, 1199 (La.1979); *Succession of Pizzillo,* 223 La. 328, 65 So.2d 783, 786 (1953); *Guillory v. Avoyelles,* 104 La. 11, 28 So. 899, 901 (La.1900). That the statute itself contains the prescriptive period, however, does not mean automatically that the prescriptive period is one of peremption. The Louisiana Supreme Court has instructed that "each case of this nature should be considered separately on its merits." *Pounds v. Schori,* 377 So.2d at 1199.

Cases holding a prescriptive period to be one of peremption turn on special considerations—primarily perceived legislative intent to create a right of limited duration. In *Pounds v. Schori* the statute created a prescriptive period for denying paternity of a child born in wedlock. The court relied on the legislative history of the statute, the manner in which French courts enforced an analogous provision of the Napoleonic Code, and the presumption that children born in wedlock are legitimate, to discern a legislative intent to create a right of limited duration. 377 So.2d at 1199. In *Succession of Pizzillo* the statute at issue effected a change in adoption laws and provided for a six-month transition period. The plain wording of the statute revealed a similar legislative intent. 65 So.2d at 786. Finally, the statute at issue in *Guillory v. Avoyelles* required that a challenge to a tax referendum be brought within three months of the election. The court reasoned that the taxpayers should be not allowed to complain after the beneficiary of the tax, in that case a railroad company, "has gone ahead and expended large sums of money in prosecuting the enterprise." 28 So.2d at 901. Thus, considerations of public policy peculiar to the statute favored holding the prescriptive period to be one of peremption. 28 So. at 900–01.

We find, however, no historic or policy considerations to suggest that the limitations period in article 3237 should be anything other than what it explicitly purports to be—a regular prescriptive period. Further, although no Louisiana cases have analyzed the nature of the prescriptive period contained in article 3237, early cases interpreting article 3204 of the Civil Code of 1825 (the predecessor article to article 3237), without discussing the issue, apply the prescriptive period as if it were one of regular proscription, and not of peremption. In *Scott v. His Creditors*, 3 La.Ann. 40 (1848), provisional seizure of the vessel suspended proscription against the party who instigated the provisional seizure. In *Blanchin v. Steamer Fashion and Owners*, 10 La.Ann. 49 (1855), the sheriff taking actual custody of the vessel suspended the prescriptive period in favor of all creditors. If the prescriptive period were peremptive, it could not have been suspended or interrupted for any reason. *See Flowers*, 364 So.2d at 931.

■ In the light of these Louisiana cases, and in the absence of any legislative history or other countervailing considerations, we will apply the six-month prescriptive period in article 3237 as a regular prescriptive period, and not a peremptive period.

### B.

■ A debtor's acknowledgment of a debt interrupts the prescriptive period. La. Civ.Code art. 3520. The debtor may acknowledge the debt verbally, or he may do so in writing, by partial payment, by payment or partial payment of interest, or by some other act or expression of intent to acknowledge the debt. *Lake Providence Equipment Co. v. Tallulah Production Credit Association*, 257 La. 104, 241 So.2d 506, 509 (La.1970); *Emery v. Cabral*, 400 So.2d 340, 342 (La.App.1981). The district court found that Dunnamis acknowledged its debt to James within six months of the time James filed this lawsuit. Our review

of the record indicates that this factual finding is not clearly erroneous.

■ James issued the first year's insurance policy to Dunnamis on July 20, 1979, at which time the premium became due. Between that date and March 20, 1980, Dunnamis made partial payments in the amount of $88,881.12, and on several occasions promised to pay the rest. These acknowledgments tolled the six-month prescription period. Then, sometime between March 20, 1980, and July 17, 1980, the date James issued the second insurance policy, Denning traveled to James' offices to inform James of the Mexican charter and to discuss continuing the insurance coverage for another year even though Dunnamis still owed premiums on the first policy. On September 29, 1980, approximately three months after James issued the second policy, James executed the Borg-Warner finance agreement, and signed a note for the amount of the past-due premiums. Finally, on January 1, 1981, three months after Dunnamis executed the agreement, James made its first judicial demand for payment.

Dunnamis' actions and assurances between July of 1979 and January of 1981 repeatedly, and at intervals of less than six months, acknowledged its growing debt to James. That the note signed in September of 1980 also created another kind of obligation, with a prescription period different from that of the privilege [4] does not affect the character of that act as an acknowledgment of a pre-existing debt. James, having filed a lawsuit approximately three months after the last acknowledgment of the debt, acted well within the six-month period contained in article 3237.

### IV.

We therefore affirm the district court's holding that James held a privilege against the three Equilease vessels for unpaid insurance premiums. By repeatedly acknowledging this debt, at intervals of less than the six-month prescriptive period, Dunnamis kept the privilege alive until

4. *See In re Red River Line,* 115 La. at 872, 40 So. at 252.

James filed a lawsuit three months after the last acknowledgment. The judgment of the district court is

AFFIRMED.