805 F.2d 561
 1987 A.M.C. 1321, 55 USLW 2352
 CUSTOM FUEL SERVICES, INC., Plaintiff-Appellant
and
Todd Shipyards Corporation, Intervenor-Appellant,
v.
LOMBAS INDUSTRIES, INC., et al., Defendants,
First Mississippi National Bank, Intervenor-Defendant-Appellee.
 No. 85-3605.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 9, 1986.
Rehearing and Rehearing En Banc Denied Jan. 8, 1987.
 
 Charles M. Steen and Don K. Haycraft, New Orleans, La., for Custom fuel.
 G. Edward Merritt, New Orleans, La., for Todd Shipyard.
 W.E. Noel, New Orleans, La., for First Miss. Nat. Bank.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, JOHNSON, and HIGGINBOTHAM, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This case is one of first impression. The question this appeal presents is whether a parent corporation can insulate its vessel from maritime liens by transferring title to its wholly-owned subsidiary as a nominal owner and taking back a preferred ship mortgage in an amount equal to the value of the vessel. The transaction was innocuous until the vessel's charterer became unable to pay its suppliers. When the suppliers seized the vessel and asserted their maritime liens, the true owner intervened to enforce the priority of its "mortgage". Because the vessel owner had acted lawfully in transferring the vessel to its subsidiary and had followed the statutory requirements for perfecting a ship mortgage, the district court upheld the priority of its mortgage. We decline to give effect to this sham and reverse the judgment of the district court.
 
 I.
 
 2
 Lombas Offshore No. 3, Inc., a corporation controlled by Anthony Lombas, owned the M/V TON LOMBAS, an oceangoing tug. First Mississippi National Bank ("the Bank") had lent the money for the vessel's purchase and took a preferred ship mortgage on the vessel. When Lombas Offshore was unable to pay its debt, the Bank foreclosed on its mortgage and purchased the vessel at the marshal's sale. Holding an unwanted vessel, the Bank searched unsuccessfully for a purchaser.
 
 
 3
 Later, Anthony Lombas approached the Bank with an offer to lease the M/V TON LOMBAS from the Bank. Mr. Lombas was negotiating with Continental Milling Corporation, which wanted to hire the vessel to tow grain barges between Louisiana and Puerto Rico. When it appeared that Lombas and Continental Milling would reach an agreement, the Bank agreed to lease the vessel to Lombas.
 
 
 4
 The lease was arranged through a step-transaction involving First Continental Leasing Corp. ("the Subsidiary"), a wholly-owned subsidiary of the Bank. The Subsidiary was created in August 1980 to allow the Bank to finance the leasing business of its sister corporation, Continental Leasing Corporation. Continental Leasing is an active leasing company, acquired earlier by the Bank's parent holding company. The Bank capitalized the Subsidiary with $1,000 and extended it a $2,500,000 line of credit. The Subsidiary could then borrow money from the Bank to purchase property for leasing. The Subsidiary had no employees and did not manage its own portfolio or seek new business. Instead, it "hired" Continental to manage its portfolio of leased property.[1]
 
 
 5
 To accomplish the lease, the Bank first "sold" the M/V TON LOMBAS to its Subsidiary for $2,600,000, the vessel's book value on the Bank's records. The Subsidiary borrowed the full amount of the purchase price from the Bank and gave a demand note and a preferred ship mortgage in return.[2] The Subsidiary then leased the vessel under a bareboat charter to Louisiana-Mississippi Carribean Corporation ("LMCC"), a corporation set up by Mr. Lombas. LMCC assigned its interest in the towage contract to the Subsidiary as security for the charter payments. The Subsidiary then assigned its interest in the towage contract and the charter party to the Bank as security for the demand note. Continental Milling was directed to pay its towing fees directly to the Bank. The Bank had permission to retain these payments to satisfy the charter hire due the Subsidiary and to deposit the balance in LMCC's account. After completion of these transactions on November 26, 1980, the Subsidiary withdrew from an active role. The Bank maintained contact with the other parties, collected and applied the payments made under the towing contract, and supervised Mr. Lombas's operation of the vessel.
 
 
 6
 The vessel operated successfully until the expiration of the towing contract and the untimely death of Mr. Lombas. On July 19, 1983, Custom Fuel Services brought this action against the M/V TON LOMBAS in rem and LMCC, Lombas Industries, Inc.,[3] and the Subsidiary in personam to recover $73,254.67 for fuel and lubricants that it had supplied to the vessel. Todd Shipyards Corporation intervened to enforce its maritime lien against the vessel in the amount of $81,384 for repairs and supplies that it had furnished to the vessel.[4] 4] The Bank intervened to enforce its preferred ship mortgage on the vessel.[5] Custom Fuel Services and Todd Shipyards then sued the Bank, requesting that the court deny the preferred status of the Bank's mortgage so that it would lose its priority over the maritime liens of Custom Fuel and Todd Shipyards. The parties reached an agreement by which the Bank was allowed to purchase the vessel at the marshal's sale, without the necessity of paying cash, and to substitute a letter of undertaking in place of the vessel pending trial on the parties' claims.
 
 
 7
 The district court held a bench trial on the claims. The parties stipulated to most of the facts. Other evidence was submitted by exhibit and deposition. The court held that Custom Fuel Services and Todd Shipyards had valid maritime liens for necessaries. The court denied their in personam claims of unjust enrichment against the Subsidiary.[6] The parties do not appeal these holdings. The court held also that the Bank had a valid preferred ship mortgage, which has priority over the maritime liens. Custom Fuel Services and Todd Shipyards appeal from this holding.
 
 II.
 
 8
 The lienors contend that the mortgage should not be given preferred status under the Ship Mortgage Act. This Act specifies the conditions under which a ship mortgage will take preference over all other maritime liens except those arising before the perfection of the mortgage.[7] One of the requirements for preference under the Act is that the mortgage must be made in good faith and "without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel".[8] The liens of Custom Fuel Services and Todd Shipyards arose after the creation of the Bank's mortgage. Therefore, the Bank is entitled to a preference if its mortgage is upheld. In this case, recognition of the validity of the mortgage would mean that Custom Fuel Services and Todd Shipyards take nothing, because the Bank bid barely more than the amount due on the mortgage.[9]
 
 
 9
 The lienors do not contend that the Bank's mortgage is per se invalid. They admit that the Bank followed the necessary procedures to obtain a preferred ship mortgage.[10] They argue, however, that the priority of the Bank's mortgage should be denied because of its contrived nature. In response, the Bank argues that there is no authority that prohibits a subsidiary corporation from granting a preferred ship mortgage to its parent. Therefore, absent proof of bad faith or fraud, this Court should respect the priority of the Bank's mortgage. To resolve this controversy, we must determine the power of an admiralty court to deny priority to an otherwise valid mortgage lien and the conditions in which denial of priority is appropriate.
 
 
 10
 The Ship Mortgage act is not a complete statute. It provides certain recording procedures, but not much more. Therefore, merely following the recording procedures does not automatically create a valid preferred mortgage entitled to priority.[11] Instead, the admiralty court must turn to other sources to determine the underlying validity of a ship mortgage.[12] Admiralty courts have turned to state law,[13] other federal laws,[14] and general principles of equity.[15]
 
 
 11
 Generally, courts will respect the separate personalities of a parent and its subsidiary.[16] A shareholder may lend money to a wholly-owned corporation and become a bona fide creditor. Such transactions, however, are subject to scrutiny for fraud, unfair dealing, or other inequitable conduct.[17] Admiralty is no stranger to these principles. Admiralty courts have not been hesitant to scrutinize preferred ship mortgages granted to related entities and, in appropriate cases, deny their priority.[18]
 
 
 12
 The power of an admiralty court to scrutinize the underlying validity of liens and mortgage claims is of ancient origin and derives from the court's historic equity jurisdiction. In Florida Bahamas Lines v. Steel Barge "Star 800" of Nassau,[19] this Court denied the priority of a maritime lien for wharfage on equitable grounds. The wharfinger was the sister corporation of the corporate vessel owner, both of which were wholly-owned by Joe Brown. Mr. Brown granted a foreign ship mortgage on his vessel and then allowed the vessel to accumulate wharfage debts in favor of his wharfage company for almost four years. When the vessel corporation defaulted on the mortgage and the mortgagee foreclosed, the wharfage company intervened to enforce the priority of its wharfage claim.[20] We denied the claim of the wharfage company, holding:
 
 
 13
 The nature of the facts in this case--which need no embellishment--"make the entire transaction subject to the sharpest scrutiny". After such scrutiny we conclude that to deny priority to the mortgagee--pecuniarily "keel hauled" by the practices and manipulations of Joe Brown--would be to exalt the corporate form and to constitute a denial of justice. Indeed, the circumstances of this case are peculiarly attuned to the gentle strains of admiralty's equity jurisdiction which, in "its traditional liberality seeks out the intrinsic justice of a cause". This Court has repeatedly given fullest play to the concept that admiralty jurisdiction embraces the resources of equity whenever the need arises.[21]
 
 
 14
 The particular circumstances that justify subordination of otherwise valid maritime mortgages have not been clearly identified by admiralty courts. We find a helpful parallel, however, in the doctrine of equitable subordination. Although developed primarily in bankruptcy law, the doctrine is not foreign to admiralty law. The doctrine comes from the bankruptcy court's inherent equitable powers,[22] a power shared by admiralty courts. Several courts and commentators have noted the applicability of the doctrine in admiralty.[23]
 
 
 15
 Three conditions are necessary to justify the equitable subordination of an otherwise valid claim:
 
 
 16
 (i) The claimant must have engaged in some type of inequitable conduct.
 
 
 17
 (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
 
 
 18
 (iii) Equitable subordination of the claim must not be inconsistent with [statutory provisions].[24]
 
 
 19
 We find that under these guidelines, the Bank's ship mortgage should be subordinated to the claims of Custom Fuel Services and Todd Shipyards.
 
 
 20
 The prerequisite to a finding of inequitable conduct is a showing that the claimant is in a position of control over the debtor.[25] The record clearly shows that the Bank controls the Subsidiary. The Bank owns all its stock and controls its board of directors. The Subsidiary has no employees of its own. Although the Leasing Company was hired to manage its affairs, the Leasing Company played a nominal role, if any, in this transaction. The Bank caused the Subsidiary's directors to approve the "purchase" of the vessel and grant the Bank a mortgage in return. When LMCC fell behind in its charter payments, it was the Bank that decided to allow LMCC to defer its payments until its affairs were in order.
 
 
 21
 Three types of inequitable conduct are sufficient to warrant subordination: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego."[26] The trial court found that the mortgage transaction was legal and nonfraudulent. We do not disturb this finding. We find, however, that the Bank's mortgage should be subordinated because of other inequitable conduct--"undercapitalization" and the "use of the debtor as a mere instrumentality". Subordination is proper on these grounds even without a finding of fraud or illegality.[27]
 
 
 22
 The aim of the inquiry under the undercapitalization and instrumentality categories of inequitable conduct is to determine the true nature of the transaction. Undercapitalization evidences a purported debt that is, in substance, a proprietary interest in the debtor.[28] The use of the debtor as a mere instrumentality exposes the same sort of sham. The "debtor" is not a true debtor, but an instrument of the controlling creditor--used for the creditor's benefit and to shield its property from the claims of other legitimate creditors.[29]
 
 
 23
 Our examination of the transaction between the Bank and the Subsidiary reveals that the mortgage is a sham. The Subsidiary was undercapitalized from its inception. It had to "borrow" the entire purchase price for the vessel. The note given to the Bank, therefore, represented nothing more than the "capitalization of its investment in [the vessel]."[30] The Subsidiary began with no equity in the vessel and ended with no equity. The demand note had no fixed payment schedule, nor did the Subsidiary make regular payments on the note.[31] Indeed, after nearly three years of the vessel's operations, the amount due on the mortgage is now greater than the amount for which it was originally issued. These circumstances "indicate that the advance was not intended to be repaid in the ordinary course of the [Subsidiary's] business, but rather was expected to remain outstanding as a permanent part of the [Subsidiary's] financial structure."[32]
 
 
 24
 Moreover, we find that the Bank used the Subsidiary as a mere instrumentality to accomplish a lease of the vessel from the Bank to LMCC. The Bank negotiated the lease with Mr. Lombas. When it appeared that a lease could be arranged, the Bank brought in the Subsidiary solely for the purpose of holding title and enabling the Bank to secure its position of ownership with a preferred ship mortgage.[33] The Subsidiary assigned all interests in the vessel--the charter and the towage contract--to the Bank. To give priority to the mortgage created by this contrivance "would be to exalt the corporate form and to constitute a denial of justice."[34]
 
 
 25
 Equitable subordination is appropriate only if the lien complaints were harmed by the inequitable conduct of the Bank. The Bank argues that had it sold the vessel to another and taken a preferred ship mortgage, the lien claimants would be in the same position--the mortgage would have priority. This argument ignores the facts: the Bank did not sell the vessel to an unrelated purchaser. The Bank tried to find a purchaser but failed. At this point, Mr. Lombas offered to lease the vessel. Had the Bank leased the vessel directly to LMCC, Custom Fuel Services and Todd Shipyards undoubtedly would have had first liens on the vessel. By the expediency of the transaction with its Subsidiary, the Bank attempted to do indirectly what it could not do directly--lease the vessel with immunity from any future liens. Recognition of the Bank's mortgage would, therefore, cause injury to the lien claimants and confer an unfair advantage on the Bank.
 
 
 26
 Equitable subordination is appropriate only if it is consistent with the statutory provisions governing the case. In this case, subordination is consistent with the provisions and purposes of the Ship Mortgage Act. The Act provides that an affidavit of good faith must accompany the recordation of the mortgage. This requirement is not merely one of form; rather, it requires that the mortgage be made in good faith and without the purpose of avoiding the claims of other creditors.[35] Moreover, subordination will not defeat the purposes of the Act. The primary purpose of the Ship Mortgage Act is to induce private capital to invest in shipping.[36] In this case, the investment was already made: the Bank had financed the original purchase of the vessel by Mr. Lombas and then acquired the vessel upon his first default. The Bank did not need the protection of the Act to induce it to later lease the vessel to one of Mr. Lombas's companies.
 
 
 27
 Finally, subordination is necessary in this case to achieve the purposes of the Federal Maritime Lien Act. The Act provides a lien for necessaries furnished to a vessel on credit. The purpose of providing a lien is to give security to those who furnish the vessel goods and services necessary to its mission. This purpose would be defeated if a vessel owner were allowed to transfer its title to a wholly-owned nominee and take back a sham mortgage sufficiently large to preclude any future lienors from recovering against the vessel. When the vessel is no longer profitable, the true owner could simply foreclose on its "mortgage" and the outstanding liens would disappear.[37]
 
 
 28
 The Bank contends that it had other legitimate reasons for structuring the transaction as it did. Additionally, the Bank points out that the interposition of a nominee vessel owner in a lease transaction is a common financing arrangement.[38] Thus, it argues that the denial of its mortgage rights will frustrate its other legitimate business purposes and "send shock waves throughout the leasing industry." We do not hold, however, that the transaction is null and ineffective for whatever other purposes it may serve. Subordination does not necessarily question the legality of the transaction; rather, it merely ensures an equitable ordering of payment from the res before the court.[39]
 
 III.
 
 29
 The purpose of the law of maritime liens and mortgages is to facilitate maritime commerce. The priority of the ship mortgage encourages private investment in shipping. The lien for necessaries encourages the provision of goods and services necessary to the vessel's mission. The owner is benefitted by the provisioning of his vessel in distant ports. In return for this advantage, the owner must subordinate his proprietary interest in the vessel to the liens of the vessel's creditors. Too often vessel owners wish to enjoy the advantages of ownership and avoid the burdens. "But when the seas get rough one who looks, thinks, acts, and profits like an owner cannot retreat to the relatively safe harbor of a maritime lienor, who of course has a claim against the ship itself."[40] Admiralty does not allow vessel owners to thwart the claims of legitimate lienholders by using a ship mortgage for a purpose it was not meant to serve.
 
 
 30
 The judgment of the district court recognizing the priority of the ship mortgage held by First Mississippi National Bank on the vessel M/V TON LOMBAS is REVERSED.
 
 
 
 [1]
 This arrangement allowed the Bank to do indirectly what it could not do directly. Banking regulations precluded the Bank from lending money to its sister corporation for the acquisition of property to lease. Therefore, the Bank purchased property through its subsidiary for Continental Leasing to lease
 
 
 [2]
 The mortgage was properly recorded with the United States Coast Guard and endorsed on the vessel's documents as required by the Ship Mortgage Act, 46 U.S.C. Sec. 922 (1982)
 
 
 [3]
 Lombas Industries, Inc. is another of the corporations headed by Mr. Lombas and was, apparently, the actual operator of the M/V TON LOMBAS
 
 
 [4]
 Gulf Outlet Fuel & Marine Supplies, Inc. also intervened, seeking to enforce a maritime lien for necessaries. Gulf Outlet did not join in the appeal from the decision of the district court
 
 
 [5]
 The amount due on the Bank's note and mortgage was $2,632,254.41 at the time of intervention
 
 
 [6]
 LMCC and Lombas, Industries, Inc. did not appear and defaults were entered against them
 
 
 [7]
 46 U.S.C. Sec. 922 (1982) sets forth the five elements of a preferred ship mortgage: (1) the mortgage is endorsed on the vessel's documents, (2) the mortgage is recorded, (3) an affidavit of good faith is filed with the mortgage, (4) the mortgage does not stipulate that the mortgagee waives his preferred status, and (5) the mortgagee is a citizen of the United States. If these requirements are met, the mortgage has priority under 46 U.S.C. Sec. 953 (1982)
 
 
 [8]
 46 U.S.C. Sec. 922(a)(3) (1982)
 
 
 [9]
 The Bank actually bid $5,000 more than its claim. After payment of the expenses of the sale, there would be little or nothing left to satisfy the maritime liens
 
 
 [10]
 The lienors do challenge, however, the good faith of the affidavit. We address their challenge in our following discussion
 
 
 [11]
 Bergren v. Davis, 287 F.Supp. 52, 55 (D.Conn.1968)
 
 
 [12]
 Id.; Southland Financial Corp. v. O.S. Mary Evelyn, 248 F.Supp. 520, 522 (E.D.La.1965); G. Gilmore & C. Black, The Law of Admiralty Sec. 9-57 (1975)
 
 
 [13]
 E.g., Bergren v. Davis, 287 F.Supp. 52, 55 (D.Conn.1968); Southland Financial Corp. v. O.S. Mary Evelyn, 248 F.Supp. 520, 522 (E.D.La.1965)
 
 
 [14]
 E.g., J. Ray McDermott & Co. v. Vessel Morning Star, 457 F.2d 815, 818 (5th Cir.), cert. denied, 409 U.S. 948, 93 S.Ct. 271, 34 L.Ed.2d 218 (1972)
 
 
 [15]
 E.g., Florida Bahamas Lines v. Steel Barge "Star 800" of Nassau, 433 F.2d 1243, 1249-50 (5th Cir.1970); Cantieri Navili Riuniti v. M/V Skyptron, 621 F.Supp. 171, 187 (W.D.La.1985), aff'd on other grounds, 802 F.2d 160 (5th Cir.1986)
 
 
 [16]
 Bergen v. Columbia Broadcasting System, 453 F.2d 991, 994 (5th Cir.), cert. denied, 409 U.S. 848, 93 S.Ct. 54, 34 L.Ed.2d 89 (1972)
 
 
 [17]
 See e.g., Pepper v. Litton, 308 U.S. 295, 306-07, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Abraham v. Lake Forest, Inc., 377 So.2d 465, 470-71 (La.App. 4th Cir.1979), writ denied, 380 So.2d 99, 100 (La.1980); In re Mader's Store for Men, Inc., 77 Wis.2d 578, 254 N.W.2d 171, 185 (1977)
 
 
 [18]
 In Equilease Corp. v. M/V Samson, 568 F.Supp. 1259, 1264 (E.D.La.1983); rev'd on other grounds, 793 F.2d 598 (5th Cir.1986), the court denied priority to ship mortgages granted by wholly-owned subsidiaries in favor of their parent. In Flood v. American O.S. Trawler Francis L. MacPherson, 258 F.Supp. 768 (D.Mass.1966), the court denied priority to a ship mortgage granted by a "dummy" corporation set up by the mortgagee. Both Equilease and Flood involved situations similar to the situation this case presents: the vessel owner transferred title to a wholly-owned or dominated corporation, took back a preferred mortgage in the amount of the purchase price, and sought to avoid later lien claims by asserting the priority of the mortgage
 In two other decisions, the court questioned the validity of the ship mortgage but continued the case for further proceedings. Security Pacific Nat'l Bank v. O.S. Pacific Pride, 549 F.Supp. 53, 54 (W.D.Wash.1982) (ship mortgage granted by partnership-vessel owner in favor of partners); Bergren v. Davis, 287 F.Supp. 52, 56 (D.Conn.1968) (ship mortgage granted by vessel owner to his mother).
 
 
 [19]
 433 F.2d 1243 (5th Cir.1970)
 
 
 [20]
 Unlike a United States ship mortgage, a foreign ship mortgage does not enjoy priority over liens for necessaries. 46 U.S.C. Sec. 951 (1982)
 
 
 [21]
 433 F.2d at 1248-59 (citations omitted)
 
 
 [22]
 Pepper v. Litton, 308 U.S. 295, 303-11, 60 S.Ct. 238, 84 L.Ed. 281 (1939)
 
 
 [23]
 See e.g., Cantieri Navili Riuniti v. M/V Skyptron, 621 F.Supp. 171, 187 (W.D.La.1985), aff'd and remanded, 802 F.2d 160 (5th Cir. 1986); West of England Ship Owners v. Patriarch S.S. Co., 491 F.Supp. 539 (D.Mass.1980); G. Gilmore & C. Black, The Law of Admiralty Sec. 9-83 (1975); Skeen, Liens and Liquidation: Preferences, Strong Arm Clause, Fraudulent Transfers, Equitable Subordination, Priorities and Other Limitations on Liens Claims, 59 Tul.L.Rev. 1401, 1418-23 (1985). Additionally, the author characterizes Steel Barge "Star 800" of Nassau as a case of equitable subordination. Id. at 1422-23
 
 
 [24]
 Matter of Missionary Baptist Foundation of Am., 712 F.2d 206, 212 (5th Cir.1983) (quoting Matter of Mobile Steel Co., 563 F.2d 692, 700 (5th Cir.1977))
 
 
 [25]
 See Weinberger v. Kendrick, 698 F.2d 61, 75 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); 3 Collier on Bankruptcy p 510.05 at 510-12 (1986)
 
 
 [26]
 Matter of Missionary Baptist Foundation of Am., 712 F.2d 206, 212 (5th Cir.1983)
 
 
 [27]
 See Equilease Corp. v. M/V Samson, 568 F.Supp. 1259, 1264 (E.D.La.1983) (admiralty case), rev'd on other grounds, 793 F.2d 598 (5th Cir.1986); In re Mader's Store for Men, Inc., 77 Wis.2d 578, 254 N.W.2d 171, 187 (1977) (state receivership proceeding); Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 94 (1961)
 
 
 [28]
 Herzog & Zweibel, note 27, at 93
 
 
 [29]
 Id. at 112; 3 Collier on Bankruptcy p 510.05 at 510-12 (1986)
 
 
 [30]
 Equilease Corp. v. M/V Samson, 568 F.Supp. 1259, 1264 (E.D.La.1983), rev'd on other grounds, 793 F.2d 598 (5th Cir.1986)
 
 
 [31]
 Although the record indicates that some payments were made, the Bank's own witnesses testified that these payments were made at the Subsidiary's convenience
 
 
 [32]
 In re Mader's Store for Men, Inc., 77 Wis.2d 578, 254 N.W.2d 171, 186 (1977) (citing numerous courts and commentators)
 
 
 [33]
 The Bank admits to this purpose in its argument on appeal: "According to the lien claimants, the bank should have leased the vessel directly to Louisiana-Mississippi Caribbean Corporation, and left the [Subsidiary] out of the transaction altogether. This ignores the realities of the situation.... More importantly, it was made abundantly clear that the bank would not permit the vessel to go into trade without first securing the bank's position with a preferred ship mortgage." Appellee's Brief at 14
 
 
 [34]
 Steel Barge "Star 800" of Nassau, 433 F.2d at 1249
 
 
 [35]
 Matter of Meredosia Harbor & Fleeting Service, Inc., 545 F.2d 583, 587 (7th Cir.1976), cert. denied sub. nom. Farmers & Traders State Bank of Meredosia v. Magill, 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359 (1977); Equilease Corp. v. M/V Samson, 568 F.Supp. 1259, 1269 (E.D.La.1983), rev'd on other grounds, 793 F.2d 598 (5th Cir.1986)
 
 
 [36]
 G. Gilmore & C. Black, The Law of Admiralty Sec. 9-48 at 691 (1975)
 
 
 [37]
 This concern has been expressed by other courts. See Equilease Corp. v. M/V Samson, 568 F.Supp. 1259, 1264 (E.D.La.1983), rev'd on other grounds, 793 F.2d 598 (5th Cir.1986); Security Pacific Nat'l Bank v. O.S. Pacific Pride, 549 F.Supp. 53, 54 (W.D.Wash.1982); Flood v. American O.S. Trawler Francis L. MacPherson, 258 F.Supp. 768 (D.Mass.1966)
 
 
 [38]
 For discussion of lease financing in the shipping industry, see G. Gilmore & C. Black, The Law of Admiralty Sec. 9-51(a) at 705 (1975); Cook, Governmental Assistance in Financing Title XI Federal Guarantees, 47 Tul.L.Rev. 653, 679-80 (1973); Angermueller, Miscellaneous Ship Financing, 47 Tul.L.Rev. 725, 725-31 (1973)
 
 
 [39]
 Pepper v. Litton, 308 U.S. 296, 310, 60 S.Ct. 238, 84 L.Ed. 281 (1939); cf. Equilease Corp. v. M/V Samson, 568 F.Supp. 1259, 1264 (E.D.La.1983), rev'd on other grounds, 793 F.2d 598 (5th Cir.1986) in which the court said: "Although the [ship mortgage transaction] was not of itself illegal, third parties must be protected from suffering financial loss caused by that arrangement."
 
 
 [40]
 Sasportes v. M/V Sol de Copacabana, 581 F.2d 1204, 1209 (5th Cir.1978)